**OLD STONE CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 92–647 C.**

United States Court of Federal Claims.

Nov. 18, 2004.

Melvin C. Garbow, Arnold & Porter, Washington, D.C., for plaintiff. Howard N. Cayne, David B. Bergman, Walter F. Zenner, and Benjamin King, of counsel.

Jane M.E. Peterson, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. Elizabeth M. Hosford, Jeffery T. Infelise, Brian A. Mizoguchi, and Tonia J. Tornatore, of counsel.

## OPINION AND ORDER

HODGES, Judge.

Plaintiff Old Stone Corporation became a bank holding company in June 1974 pursuant to the Bank Holding Company Act of 1956, 12 U.S.C. §§ 1841–1849. Old Stone Corporation was the sole shareholder of a commercial bank subsidiary, Old Stone Bank. The bank had been organized in Rhode Island as a mutual savings bank in 1819 and operated under that charter until 1974 when it became a commercial bank.

The Federal Home Loan Bank Board approached Old Stone's management in 1984 seeking a buyer for a failing thrift known as Rhode Island Federal Savings Bank.[1] Savings and loan regulators typically guaranteed certain benefits to acquiring investors during this period as consideration for their assumption of institutions that had negative net worth. Such incentives included agreements to forbear enforcement of normal regulatory requirements, use of capital credits, and recognition of the negative net worth as "good-

will." The goodwill could be used as regulatory capital to maintain required minimum capital ratios and to leverage loans as if it were tangible capital. The goodwill could be amortized over a period of thirty or forty years as an asset might be.

The savings and loan crisis of the 1980's prompted Congress to enact the Financial Institution Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, to gain control of problems that it perceived in the savings and loan industry.[2] The new law eliminated or modified a number of investors' contracts with the Government.

This court found that Congress breached the investors' contracts by enacting FIRREA. *Winstar Corp. v. United States,* 21 Cl.Ct. 112 (1990). The Federal Circuit and the Supreme Court agreed. *See Winstar Corp. v. United States,* 64 F.3d 1531 (Fed. Cir.1995) (en banc), *aff'd,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The Supreme Court remanded *Winstar*-related cases for consideration of damages. 518 U.S. at 910, 116 S.Ct. 2432.

Old Stone Corporation, an investor affected by the breach, filed suit against the United States in 1992. The Federal Deposit Insurance Corporation joined the case as receiver in 1996. Proceedings were delayed by the effects of a pretrial discovery agreement among the Department of Justice and more than 120 plaintiffs with similar actions. Plaintiff's case was assigned to this court last year, and we heard oral arguments on pending cross-motions for summary judgment on liability. We ruled for plaintiff on summary judgment. *Old Stone Corp. v. United States,* No. 92–647C (Fed.Cl. Apr.10, 2003); *see also Old Stone Corp. v. United States,* No. 92–647C (Fed.Cl. Apr.25, 2003) (denying defendant's motion for reconsideration).[3]

---

1. The Home Loan Bank Board had approached Old Stone earlier seeking a merger with Rhode Island Federal, but did not offer inducements and plaintiff declined.

2. See *Hansen Bancorp, Inc. v. United States,* 367 F.3d 1297, 1302–03 (Fed.Cir.2004), for a concise summary of the circumstances surrounding the passage of FIRREA.

3. We often use descriptive names in this Opinion for the most part to avoid confusion. For example, Old Stone Corporation or "OSC" is the holding company. Old Stone is the commercial bank before the merger, and often simply "the bank" after the merger. Old Stone Bank, or "OSB," is Old Stone Bank, FSB, the merged

Plaintiff filed a motion for partial summary judgment on damages limited to claims that it described as *"Landmark-style"* restitution. *See Landmark Land Co. v. FDIC,* 256 F.3d 1365 (Fed.Cir.2001). Plaintiff considered the issues in its summary judgment motion to be so similar to those addressed in *Landmark* that it was willing to forgo claims for reliance damages and other theories that would require trial. Restitution does not depend on proof of traditional breach elements such as causation and foreseeability, but it does require a finding of "total breach." *See Hansen Bancorp, Inc. v. United States,* 367 F.3d 1297, 1309–13 (Fed.Cir.2004) (holding that a finding of total breach may not be appropriate on summary judgment). We denied plaintiff's motion for partial summary judgment on damages and scheduled trial beginning in May 2004. *Old Stone Corp. v. United States,* No. 92–647C (Fed.Cl. Mar.28, 2004). Defendant abandoned its counterclaim against the Federal Deposit Insurance Company, and the FDIC withdrew from the case. The parties filed post-trial briefs concurrently in July and completed their replies in August. Testimony and other evidence presented at trial established that plaintiff is entitled to judgment on its claims.

## I. BACKGROUND

Old Stone Bank obtained a charter in the State of Rhode Island as a mutual savings bank in 1819 and operated in that capacity until 1974 when it became a commercial bank. (Tr. at 134.) Old Stone Corporation became a bank holding company and the sole shareholder of Old Stone Bank in June 1974. The bank's earnings were good, but management and government regulators were concerned about capital, a "constant worry." (Tr. at 2480.) A 1981 FDIC Report of Examination stated that the bank's capital levels were "inadequate." (Def.'s Ex. 304 at 1–

bank. "RIF" is Rhode Island Federal, the troubled thrift.

4. Old Stone Bank's capital ratio in 1984 was below the 5.5% minimum required by the Federal Deposit Insurance Corporation. The FDIC was the insurer and regulator of Old Stone Bank at the time. However, a regulator testified that Old Stone Bank was in capital compliance with FSLIC and FHLBB after the merger in 1984.

1.) A new law known as Garn–St. Germain offered plaintiff new opportunities.

### A. Garn–St. Germain

Congress passed the Garn–St. Germain Depository Institutions Act of 1982, Pub.L. 97–320, to assist the restructuring of the savings and loan industry. This law was designed to make it easier for healthy institutions to acquire troubled thrifts. It included a priority system for the Government to consider offers from potential acquiring institutions. 12 U.S.C. § 1730a(m)(2)(B), *repealed by* FIRREA, Pub.L. No. 101–73, Title IV, § 407. The new law assigned the highest priority to thrift institutions in the same state as a troubled thrift. The next level of priority was a thrift institution in another state. Non-thrift institutions such as banks or bank holding companies in the same state as the troubled thrift were assigned third priority. Last on the list of priorities were out-of-state, non-thrift institutions. Thus, Old Stone had third priority in acquiring a failing thrift in Rhode Island and last priority outside the state.

Plaintiff's counsel explained that some provisions of Garn–St. Germain created "an attractive means of acquiring troubled thrifts . . . ." (Tr. at 129–30.) "[W]e had inquired into the possibility of acquiring troubled thrifts in other states, but that was not too likely until the Garn–St. Germain Act passed, in which case we saw perhaps an opportunity to move out of just our little state into other states where we could grow our business."[4] (*Id.*)

Plaintiff's counsel stated that obtaining the transfer of a major institution like Old Stone to the savings and loan insurance fund was "a feather in FSLIC's cap." (Tr. at 3156.) Old Stone and Old Stone Bank were prepared to pay more than a million dollars per year in premiums to FSLIC, counsel stated.

An OTS examination in 1988 yielded a composite score of 2. (Def.'s Ex. 429 at 2.) See *infra* note 11 for an explanation of the composite scoring system. Old Stone had total resources of $1,854,468,000 and total deposits of $1,067,321,000 when the transaction occurred. (Def.'s Ex. 18 at 3.) Rhode Island Federal had total resources of $138,633,000 and total deposits of $111,444,000. (*Id.*)

(*Id.*) One of defendant's experts testified that the premiums were $1.5 million per year. (Tr. at 1493.)

Old Stone was on FSLIC's "premier priority acquirer list" according to plaintiff. (Tr. at 3157.) Government regulators were very concerned about the health of the insurance fund and the consequences of widespread thrift failures. Plaintiff noted that "had FSLIC ever defaulted, it would be a calamity of [great] magnitude ... [s]o FSLIC was very, very eager that these transactions take place." (Tr. at 3158–59.) FSLIC put Old Stone on the preferred list to encourage Old Stone to acquire thrifts, to make additional acquisitions, to raise substantial capital, and to expand. (Tr. at 2489.)

Mr. Major, Old Stone Corporation's general counsel, testified that mutual savings banks generally were limited to the New England area and to the Northwest. (Tr. at 133.) He explained that the savings bank structure permitted "a mix of assets, mostly real estate loans, but also some commercial loans, so that we had had some experience up through the years with commercial loans while we were a mutual savings bank." (Tr. at 133–34.) For this reason, the bank was interested in obtaining a federal savings bank charter. Federal savings banks were a relatively new type of institution at the time. The federal savings bank "was different from a traditional savings and loan because it did allow for commercial lending, business lending powers, which is something that savings and loan associations traditionally did not have." (Tr. at 134.)

Mr. Rosati was the president and chief executive officer of Old Stone Corporation. He stressed the greater "flexibility" of the thrift holding company structure that would accompany a federal savings bank charter (Tr. at 142–43) and the opportunity to expand Old Stone's business into other financial services areas (Tr. at 137). Old Stone Corporation felt that it could accomplish both goals when FSLIC and the Federal Home Loan Bank Board began looking for investors that were interested in acquiring troubled or failing thrifts.

Old Stone was the second-largest financial institution in Rhode Island at the time. (Tr. at 129–30.) Mr. Major commented that as a result, "there wasn't much room to grow." (Tr. at 129) "[Old Stone] couldn't acquire other ... institutions because of antitrust considerations[, and] ... couldn't grow into other states because there were interstate banking laws at that time .... [The bank was] looking for ways to grow [its] deposit franchise in other states and the banking laws traditionally had not allowed that." (Tr. at 130.) Old Stone had another consideration for its interest in the deal.

> We had three regulators before[:] the Federal Reserve for the holding company, the FDIC for the bank and also the state of Rhode Island because we were state chartered. And instead we would have one regulator, the Federal Home Loan Bank system. It would allow for the expansion into other businesses that we might think appropriate and provide us more flexibility with the regulatory framework because we didn't have those three different regulators to have to account to regularly.

(Tr. at 141–42.)

The Federal Savings and Loan Insurance Corporation and the Federal Home Loan Bank Board were looking for investors in the failing thrifts. "Old Stone was familiar with that kind of institution and it seemed like the perfect mix for us, this new federal savings bank charter[,] so we were very interested." (Tr. at 134.) FSLIC offered a failing thrift known as Rhode Island Federal to plaintiff in 1983. (*Id.*) Old Stone conducted a due diligence exam, but declined to bid on Rhode Island Federal because the regulators did not offer financial assistance or regulatory capital forbearances. (Tr. at 146–47.) Later, regulators approached Old Stone with offers of financial assistance, forbearances, and waivers. This renewed Old Stone's interest in obtaining Rhode Island Federal. According to Mr. Major, the bid package FSLIC was offering

> not only provided for financial assistance, cash assistance to help fill up the negative net worth of the institution but also would allow capital treatment, regulatory capital treatment for the capital that would be infused, would be allowed regulatory accounting treatment as a capital credit, ...

and if supervisory goodwill were created as a result of the acquisition, that it would be able to be amortized or written off over a long period of time.

(Tr. at 147.) Such merger incentives were part of a regulatory scheme called the Phoenix Program.

Government regulators devised and implemented the Phoenix Program in an attempt to sustain the savings and loan industry and to avoid exhaustion of the FSLIC insurance fund. *See, e.g., LaSalle Talman Bank, FSB v. United States,* 317 F.3d 1363, 1366–68 (Fed.Cir.2003). The intent of the Program was to consolidate

> failing or failed thrifts into ... association[s] that would ... achieve efficiencies and receive close regulatory oversight ... [and] also receive significant [government] assistance .... [Program] assistance included direct monetary contributions [and] regulatory forbearances. [Regulators also authorized the use of] a purchase accounting system whereby assets and liabilities [of the troubled thrift] would be revalued at market price .... [T]he ensuing net liability would be recorded as an asset called "supervisory goodwill" and accorded an extended amortization term.

*Id.* at 1367. The regulators' offer of these incentives to Old Stone was memorialized in the Assistance Agreement (Pl.'s Ex. 135).

### B. The Assistance Agreement

Old Stone Corporation attorneys negotiated the terms and conditions by which plaintiff would acquire Rhode Island Federal during a period of more than a month. (Tr. at 173–79.) The resulting Assistance Agreement incorporated a Stock Acquisition Agreement, a Forbearance Letter, and the Net Worth Maintenance Stipulation.

The Assistance Agreement directed Rhode Island Federal to form a first-tier service corporation called Newco. Rhode Island Federal would transfer cash to Newco in exchange for Newco's stock. Old Stone Corporation, the holding company, would transfer the stock of Old Stone Bank to Newco as a "contribution of capital." (Pl.'s Ex. 135 at 2, § 2(4) at 4.) Newco then would direct Old Stone Bank to distribute its assets and liabilities, except certain trust assets, to Rhode Island Federal. Finally, Rhode Island Federal would change its name to Old Stone Bank, FSB.[5]

Bank attorneys sent a letter to the Government the following month setting out other aspects of the transaction to which negotiators had agreed. (Pl.'s Ex. 74.) Old Stone Bank would remain in existence as a second-tier subsidiary of Old Stone Bank, FSB and operate as a trust company. Newco would remain a first-tier service corporation. Plaintiff also sent a letter to the Government in July 1984 requesting additional forbearances and waivers. (Pl.'s Ex. 45.) Among them were (1) the use of push-down accounting to record the purchase of Old Stone Bank, FSB's capital stock, (2) treatment by FSLIC of its cash contribution as a credit to OSB's net worth, and (3) amortization of intangible asset value according to the straight-line method over a thirty-year period.

FSLIC agreed to contribute $9.55 million cash to the thrift. Regulators would permit the resulting thrift, Old Stone Bank, FSB, to operate immediately. Furthermore, FSLIC would indemnify the bank from losses and expenses for liabilities not listed at closing on the balance sheet of Rhode Island Federal. It also would defend the bank from actions challenging FSLIC's authority to approve the transaction or the authority of the holding company, the bank, or Rhode Island Federal to consummate the transaction.

In August 1984 FHLBB made findings approving the supervisory conversion of Rhode Island Federal. (Def.'s Ex. 15.) Old Stone sought consent from FDIC in Septem-

---

5. One result of the transaction was the conversion of the failing thrift, Rhode Island Federal, from a federal mutual savings and loan to a federal stock savings bank. The Federal Home Loan Bank Board was authorized to convert a mutual institution into a stock institution or into a federal stock savings bank in certain circum- stances. For example, it could permit such a conversion "if the Director has determined that severe financial conditions exist which threaten the stability of an association and that such authorization is likely to improve the financial condition of the association ...." 12 U.S.C. § 1464(p)(2)(A).

ber 1984 to transfer assets to Rhode Island Federal in consideration of Rhode Island Federal's assumption of the bank's deposit liabilities:

> Old Stone Bank ... with total resources of $1,854,468,000 and total IPC deposits of $1,067,321,000, has applied, pursuant to Section 18(c)(1)(C) of the Federal Deposit Insurance Act, for the Corporation's consent to transfer certain assets to Rhode Island Federal Savings and Loan Association ... with total resources of $138,633,000 and total IPC deposits of $111,444,000 ... in consideration of the assumption of the liability to pay deposits made in Old Stone Bank.

(Def.'s Ex. 18 at 3.) The FDIC expedited the application by waiving publication of notice and authorizing immediate consummation of the transaction. (*Id.* at 2.) The FDIC did this because it wanted "to prevent the probable failure" of a federal institution. (*Id.* at 1.) The FDIC issued an approval letter on September 17, 1984, conditioned upon the bank's "attainment of a minimum capital/assets ratio by December 31, 1985." (*Id.*) The FDIC added the following regarding the Federal Home Loan Bank Board: "The [FDIC's] Board of Directors in deciding to approve this application did so with the understanding that [FHLBB's] Board of Directors would amend its approval Resolution to contain an identical minimum capital requirement." (*Id.*) An October 19, 1984 letter from the Federal Home Loan Bank Board to the president of Old Stone Bank at the time, Joseph F. Murphy, stated that the Board's $9.5 million contribution to Rhode Island would be "a credit to the FSB's net worth; therefore, for regulatory accounting purposes, the FSB may book such contribution as a direct addition to its net worth." (Def.'s Ex. 23 at 4.) Thus, Old Stone Corporation became a thrift holding company owning 100% of the shares of Old Stone Bank, FSB. Old Stone Bank, FSB had two subsidiaries— Newco, the service corporation, and Old Stone Bank, then a trust company.

## C. The Breach

Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act in 1989 as part of an extensive overhaul of the savings and loan industry.[6] Pub.L. No. 101–73. FIRREA banned many of the inducements offered by the regulators through the Phoenix Program and tightened liquidity requirements.[7] Some of these inducements were similar to those offered in connection with the supervisory mergers of Rhode Island Federal and of Citizens Federal. *See Winstar,* 518 U.S. at 847–48, 116 S.Ct. 2432.

The Federal Circuit summarized the action by Congress and its effect, in part, as follows:

> Despite the superficial appeal of supervisory mergers, these arrangements could not rescue the industry and the FSLIC from a worsening crisis. In 1989, Congress intervened by enacting FIRREA. As part of an extensive reformation of the savings and loan industry, FIRREA mandated minimum capital requirements and prohibited the use of supervisory goodwill. No longer able to rely on supervisory goodwill, many thrifts could not comply with FIRREA's capital requirements and were seized by regulators.

*Hansen,* 367 F.3d at 1303 (citation omitted). The Government's breach eliminated capital credits from Old Stone Bank's regulatory capital. The regulators required Old Stone Corporation to compensate for the difference by enforcing the Net Worth Maintenance Stipulation. Regulatory approval of the holding company's proposed Capital Plan af-

---

**6.** *See, e.g., Winstar,* 518 U.S. at 845, 116 S.Ct. 2432 (noting that 435 savings and loans failed during 1981–1983). The Government's estimated cost to pay depositors was $15.8 billion in 1985. *Id.* at 847, 116 S.Ct. 2432.

**7.** For example, FIRREA imposed new minimum capital requirements that typically were contrary to assistance agreements that bank regulators had issued to investors. These included: (1) tangible capital equal to at least 1.5% of assets; (2) core capital equal to at least 3% of assets; and (3) risk-based capital requirements related to risk-weighted balance of total assets. *See* 12 U.S.C. §§ 1464(t)(2)(A)-(C); 12 C.F.R. § 567. *Minimum,* adequate core capital increased to 4% effective December 1, 1992. *See* Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242.

ter breach was dependent on plaintiff's compliance with the Net Worth Maintenance Stipulation.

Mr. Rosati, Old Stone Corporation's chief executive officer at the time, testified that the bank lost $80 million in capital as a result of Congress' enactment of FIRREA and the resulting loss of goodwill as regulatory capital. (Tr. at 2361.) Regulatory capital was a cushion that the bank depended on heavily, he noted (Tr. at 2368–71); it accounted for forty percent of the bank's capital (Tr. at 2370). The bank replaced this capital in part by selling subsidiaries. Mr. Rosati stated that it was not a good time to sell, and the fire-sale circumstances exacerbated the problem. (Tr. at 2362–63.) Old Stone Corporation could have sold the subsidiaries for more had it waited, but the regulators gave it no choice. (Tr. at 2363–64.)

Moreover, the earnings from the sale of subsidiaries could not be redeployed. (Tr. at 2363.) The bank could not put the earnings into other earning assets as banks normally do because of the need to shrink the bank and to raise capital.[8] (Tr. at 2363.) Regulators told Mr. Rosati that the holding company was obligated to meet the requirements of the Net Worth Maintenance Stipulation, even though the Government had breached the Assistance Agreement to which it was a party.[9]

Old Stone's management conducted a "strategic review" concluding in September 1989. (Pl.'s Ex. 360 at 16.) The Office of Thrift Supervision required Old Stone to prepare a Capital Plan, which it approved in March 1990. Plaintiff's Capital Plan set out its strategy to deal with asset quality issues and to satisfy the regulators' demands for improved capital ratios. Management stated in the Capital Plan that it would "address asset quality issues with increased reserves and writedowns where necessary." (Id.)

"Since the asset quality measures would be detrimental to the capital objectives, management will divest of several subsidiaries to restore capital accounts and to focus its capital resources on the Rhode Island operation." (Id.)

The Capital Plan also included the following:

[T]o reduce credit risk as well as to meet FIRREA guidelines relating to non-residential real estate assets, Old Stone has largely discontinued its commercial real estate lending operations ... and sold its California residential construction lending unit. The assets produced by these divisions have been among the highest yielding in the Bank's portfolio with substantial fee generation as well. The winddown of expenses related to these activities will occur throughout 1990 but not as rapidly as the income reduction.

(Id. at 17–18.) Old Stone's Capital Plan also represented to the regulators that management would "mitigate the capital reduction [by] ... mov[ing] quickly to sell certain subsidiaries and divisions ...." (Id. at 18.) These efforts to raise capital included (1) sale of the bank's California lending unit known as OSCal in December 1989; (2) sale of the bank's tuition-budgeting company for a $22 million gain in December; and (3) an agreement to sell the Seattle, Washington-based thrift that was a division of Old Stone Bank, FSB in 1989. (Id.)

The Office of Thrift Supervision approved the bank's Capital Plan conditioned on Old Stone Corporation's agreement that it would maintain the bank's capital position pursuant to the Net Worth Maintenance Stipulation. The holding company contributed a total of $74.5 million of additional capital to the bank from 1990 through 1992.[10] Management reported that it had reached the Capital Plan

---

8. Old Stone Bank had sold OSCal, the bank's California lending unit, in December 1989 to raise capital, and it had sold Old Stone Bank of Washington in May 1990 in a similar effort to improve its capital position. It made a $9.2 million profit on the sale. (Tr. at 740, 826, 916.)

9. They backed up such directives with the threat of cease and desist orders and civil penalties, though Mr. Peckham, a testified that he had seen

only one case of civil penalties in his years as a regulator. (Tr. at 1017–19.) That was an egregious case involving "a lengthy criminal proceeding," he said. (Tr. at 1019.)

10. The holding company downstreamed additional capital of $45,463,000 in 1990; $27,500 in 1991; and $1,600,000 in 1992. (Tr. at 315.)

goals submitted in 1990. Despite these efforts, the bank had fallen out of compliance at the 1991 examination by the regulators. The next step was the Capital Directive.

The bank described the Capital Directive as "a regulatory order which governs the activities of the bank." (Tr. at 362.) "It limits the kinds of assets that the bank can invest in." (Tr. at 362.) "It limits the growth of the bank and it directs that certain actions be taken to improve the capital position of the bank." (Tr. at 362.) Plaintiff's general counsel, Mr. Major, testified that

> [the] directive did not allow any growth whatsoever. It required continued shrinkage. Before, under the capital plan, we at least were able to grow by the amount of interest credited to our deposit accounts, but this did not even permit that form of growth. So we had to just continually shrink the bank, sell assets, not redeploy any payments that were received but, rather, use those to pay off liabilities so that the ratio, we would come into compliance with a ratio by shrinking the size of the denominator of that fraction.

(Tr. at 363–64.)

Congress phased out the bank's contract right to count goodwill as tangible capital after December 31, 1989 with the enactment of FIRREA. Other capital ratios were affected as well. *See* 12 U.S.C. §§ 1464(t)(2)(A)-(C), 12 C.F.R. § 567. Bank examiners reported to OSB's Board of Directors on June 22, 1990 that the bank's condition was unsatisfactory. (Pl.'s Ex. 380 at 1.) Regulators had assigned a composite rating of 4 to the bank after its examination.[11]

> Your institution's serious asset quality problems are the major factor contributing to this overall unfavorable assessment. The institution's poor earnings performance and its failure to meet its risk-based capital requirement result directly from asset quality deterioration. Your institu-

tion is dependent upon its parent holding company to provide sufficient infusion of capital in the near term.

(*Id.*)

## D. Shrinking the Bank

The bank found it necessary to shrink after the breach to meet required capital ratios. The capital ratio is a relationship between capital and assets. A bank may improve its capital ratio either by increasing capital—often a difficult goal to accomplish in the circumstances—or shrinking the bank's assets. That is, sell assets that often serve as the bank's primary source of earnings. Either strategy creates a higher capital ratio. As banks sell their best assets to raise capital, however, their income drops dramatically.

Testimony and other evidence presented in this case does not show why regulatory agencies found this to be a useful approach to the problem. Not only did banks lose income-producing assets, but also they missed potentially valuable opportunities to grow and prosper. For example, Old Stone had intended to acquire Home Savings of North Carolina. It entered into negotiations with Home Savings but cancelled the transaction because management decided that it must concentrate on meeting FIRREA's capital requirements instead of acquiring another institution. Mr. Major testified,

> one of the ways that we were being called upon to come into compliance was for the holding company to contribute capital pursuant to the net worth maintenance [stipulation] to Old Stone Bank[, FSB]. And Old Stone of North Carolina was a very profitable company, very attractive market, and the sale of that company would have been able to generate lots of cash, that then would have, we would have been able to

---

**11.** CAMEL ratings are used by regulators to provide an assessment of a financial institution's condition and operations in the areas of Capital Adequacy, Asset Quality, Management, Earnings, and Liquidity. A composite rating, or "CAMEL rating," of 4 means that the bank is relatively unsound. The ratings range from 1 to 5, with the higher numbers being the more unsound. Composite ratings are comprised of the ratings for each of the areas listed. The terms "composite CAMEL rating" and "CAMEL composite rating" also are used in examination reports by bank regulators. The bank's CAMEL rating in 1984 was 2.

infuse into Old Stone Bank[, FSB] to meet capital shortfall.

(Tr. at 312.)

Mr. Rosati testified that shrinkage caused the bank to lose its "three crown jewels." (Tr. at 2379.) These were Old Stone Credit Corporation, which was earning approximately $36 million per year,[12] Old Stone of North Carolina, with $6 million in annual earnings, and Old Stone California (OSCal), which was earning one to two million dollars. (Tr. at 2379.) "So that's approximately $38 million of continuing earnings," he stated.[13] (Tr. at 2379.)

OSCal, a tuition financing company, was sold in 1989. Sale of OSCal and Academic Management Services raised $22 million in new capital. The bank could not reinvest the proceeds in income-generating assets but paid down liabilities and increased its capital reserves to improve its capital/assets ratio. OSCal and Academic Management Services had been generating $7 million in annual earnings. Plaintiff sold Old Stone Bank of Washington in May 1990. That branch had been producing $5 million a year in earnings.[14]

Asset quality continued to deteriorate. Old Stone Bank filed a Revised Capital Plan on December 1991. The bank submitted another Revised Capital Plan in October 1992, but later in the year the bank fell below all three regulatory capital requirements. Management officials testified convincingly that the bank could have been saved had regulators been willing to give them more time to conclude a proposed agreement by which outside investors would have put new capital into the bank.[15] Regulators testified that they had heard many such proposals and that many deadlines had passed. They felt that they had to cut off the process at some point. The regulators were not in full agreement concerning the need to close the bank when they did. Plaintiff filed this lawsuit in 1992. The Government seized Old Stone Bank on January 29, 1993.

The issue is not whether the Office of Thrift Supervision acted wisely or appropriately in closing the bank. The issue is the proper remedies to apply in calculating damages. Plaintiff argued that it is entitled to reliance damages, restitution, and costs of mitigation.

---

**12.** At another point Mr. Rosati testified that the Credit Corporation earned $28 million; he may have been talking about totals:

> Old Stone Credit Corporation was a very solid earning and growing company.... [S]imilarly to what happened in the bank by selling the assets of the corporation under the net worth maintenance [stipulation] ...we did and were forced to do several things. By selling them we lost the continuing earnings stream that was $28 million, and we had every reason to believe that those earnings would have continued. I think that there would have been years of increase, maybe years of a little flat growth, but they were good, solid earning companies. We were not able to redeploy funds, because we had to pay down liabilities. We did put $20 million into the bank as part of this transaction.

(Tr. at 2380.)

**13.** Defendant cited Mr. Rosati's testimony that the Rhode Island Federal transaction "did not involve a large amount of capital and ... standing alone, OSC never would have signed the net worth maintenance [stipulation] for RIF." (Def.'s Post–Trial Reply Br. at 3 (citing Tr. at 2487–89).) Asked why he agreed to the transaction, he stated "I did it for one reason, so it would make additional acquisitions ... raise substantial capital

and to expand." (Tr. at 2489.) Asked if such additional acquisitions were made, he said,

> [y]es, in 1985 Old Stone acquired Citizens. As a result I believe additional regulatory capital of approximately $74 million came with that transaction, so it was significant at that point. Aggregating that with Rhode Island Federal, I believe the total number was in the neighborhood of 90, 94 million dollars.

(Tr. at 2489.)

**14.** Defendant argues that plaintiff would have sold its Washington branch anyway, and in fact tried to do so several times before the breach— but if so, this evidence is not meaningful legally.

**15.** Lead counsel for the Government commented,

> [Management] made efforts. They cooperated. And they tried to make a go of it. I don't think the evidence would suggest otherwise. But what the evidence, the unrefuted evidence supports is that it didn't work. It simply didn't work. And ... regardless of their best intentions, they couldn't pull it out.... I agree that the regulators thought very highly of them. Mr. Gridley testified he thought very highly of Mr. Rosati. But he couldn't get it done.

(Tr. at 3225.) In fact, we think management could have "pulled it out."

## II. DAMAGES

The Financial Institution Reform, Recovery, and Enforcement Act eliminated or modified many of the promises that FSLIC had made to Old Stone Corporation in connection with its acquisition and conversion of Rhode Island Federal. *See Winstar*, 518 U.S. at 856–58, 116 S.Ct. 2432. The Supreme Court found that FIRREA effectively breached the promises that the Government had made to investors who had agreed to take over failing thrifts. *Id.* at 870, 116 S.Ct. 2432.

"When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934). The contract remedies to which the Government becomes subject in this case are reliance and mitigation damages, and restitution, and mitigation. Plaintiff may seek compensation for losses sustained or it can demand that defendant return its money. The former remedy permits compensation for losses, typically reliance or mitigation damages; the latter is restitution, primarily a demand for disgorgement. Old Stone is not seeking expectancy damages.

Applying standard breach damage theories to "the complex fact patterns of these cases" has been a challenge both to trial courts and to attorneys who present such theories. *Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1312 (Fed.Cir.2004). Two issues complicate this further. The Court of Appeals for the Federal Circuit has expressed concern about the possibility of creating a "windfall" for the non-breaching party in awarding damages. *Hansen*, 367 F.3d at 1315 (noting that restitution is inappropriate "where relief would result in an 'unfair windfall' to the non-breaching party"). Yet, " '[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery,' and the court's duty is to 'make a fair and reasonable approximation of damages.' " *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1356–57 (Fed.Cir.2001) (quoting *Locke v. United States*, 151 Ct.Cl. 262, 267, 283 F.2d 521, 524 (1960)). That is, damages must be fair. Uncertainty as to amount is not a bar.

Reliance damages are traditional contract damages. The Federal Circuit has urged litigants and trial judges to avoid doctrinal disputes regarding damage theories in these cases and to return non-breaching parties to their rightful conditions. *See Glendale*, 378 F.3d at 1313 ("We remain optimistic that with the additional guidance and support given the trial court . . . the remainder of the Winstar cases can be disposed of . . . based on the particular facts of the case, and without further dispute over the theory on which damages may be calculated."). The courts are thus directed to de-emphasize theories of recovery and focus on the status of the parties. *Id.*

We ruled in *Landmark Land Co. v. United States* that the investors' contribution pursuant to an assistance agreement could be returned either as restitution or as reliance damages. 46 Fed.Cl. 261, 278 (2000), *aff'd in part, rev'd in part, vacated in part sub nom. Landmark Land Co. v. FDIC*, 256 F.3d 1365 (Fed.Cir.2001). As restitution, the court would return or "disgorge" the benefit that defendant obtained from plaintiff's participation in the agreement. *Id.* Reliance damages would equal the amount that plaintiff contributed in accordance with the terms of the contract that defendant breached. *Id.* Restitution was a fair and reasonable approximation of plaintiff's damages in that case. As it happened, the two theories produced the same award to Landmark.

Reliance damages assume a valid contract, while restitution assumes that the contract is void and without effect. A plaintiff seeking reliance damages must show that: (1) its losses were reasonably foreseeable at the time of the contract; (2) the breach was a substantial factor in causing its losses; and (3) it has proven its losses with reasonable certainty. *See Bluebonnet Sav. Bank, FSB v. United States*, 47 Fed.Cl. 156, 167 (2000), *rev'd on other grounds*, 266 F.3d 1348 (Fed. Cir.2001); *see also Restatement (Second) of Contracts* §§ 344(b), 351–52 (1981).

Awarding damages according to a restitution analysis can require consideration of

whether the breach was "total," whether it could create a "windfall," and whether the non-breaching party waived its rights by continued performance. According to most authorities, the main purpose of restitution is to prevent unjust enrichment of the breaching party. *See Restatement (Second) of Contracts* § 344 cmt. a (1981). It is not a damage remedy. *See* Dan B. Dobbs, *Law of Remedies: Damages, Equity, Restitution* § 4.1(1) (2d ed.1993).

"Money-back restitution" is the remedy discussed in *Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 608, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000), *Landmark,* 256 F.3d at 1372–73, and *Hansen,* 53 Fed.Cl. at 101. Restitution in the *Winstar* context arises where the non-breaching party made an initial investment in the thrift according to a requirement of the contract. The Federal Circuit has "allowed restitution for the limited purpose of returning the acquiring thrift to the status quo ante when *specific initial contributions* to an acquired thrift have been established." *Glendale,* 378 F.3d at 1313 (citing *Landmark,* 256 F.3d at 1373–74) (emphasis added).

Parties claiming restitution may find that they have waived that remedy by continuing to perform under the contract after the breach. *Mobil Oil,* 530 U.S. at 622, 120 S.Ct. 2423. Reliance damages are available for costs incurred before and after the breach. Old Stone incurred a large portion of its alleged damages after the breach. The standard for reliance damages is not whether the expenditures were required under the contract, but whether the expenditures were made in reliance upon the contract. For restitution, plaintiff would have to show that the contract required an expenditure; for reliance, that it spent the money because of the contract. *Landmark* 256 F.3d at 1379; *Restatement (Second) of Contracts* § 344 (1981).

Returning the parties to the situation in which they found themselves pre-contract may require more than return of the benefits conferred on the breaching party. *See Landmark,* 256 F.3d at 1372. Another measure may be "the *cost* of the plaintiff's performance, which includes both the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its performance under the contract." *Id.,* at 1372. Perhaps concerned that such "other costs incurred" may confuse restitution with reliance damages, the appeals court explained that while the "two approaches to restitution are not necessarily incompatible, we have observed that the 'costs' measurement may sometimes be more properly viewed as a form of reliance damages." *Hansen,* 367 F.3d at 1314 n. 13 (citing *LaSalle,* 317 F.3d at 1376 (citing *Acme Process Equip. Co. v. United States,* 171 Ct.Cl. 324, 359, 347 F.2d 509, 530 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966)) ("When restitution damages are based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages, wherein the non-breaching party is restored to its pre-contract position by returning [to it] as damages the costs incurred in reliance on the contract.")).

The Federal Circuit noted that the "problem with which the trial court has had to wrestle has been finding a viable damages theory that fits the complex fact patterns of these cases, one that is fair to the damaged thrifts, but is based on real losses sustained so as not to overcompensate for the breach." [16] *Glendale,* 378 F.3d at 1312. We discuss restitution in additional detail below, but the Circuit's direction that the court prefer reliance as a remedy controls the overall analysis. " 'Reliance is an ideal recovery in Winstar cases.' " *Glendale,* 378 F.3d at 1313 (quoting Jon W. Burd, *Where The Rabbit Hole Ends: A Working Model For Measuring Winstar–Type Damages In The Federal Circuit,* 13 Fed. Cir. B.J. 657, 685 (2004)).

---

16. This has been a common complaint among trial judges handling the *Winstar* line of cases. For example, the trial court in *Hansen* commented, "the *Winstar* litigation suffers from the lack of any template." 53 Fed.Cl. at 108. "The result is that common issues must be relitigated in each case. Moreover, the numerous decisions on summary judgment have led to piecemeal decisions on, for example, the proper measure of damages ...." *Id.*

"Despite the landscape where alternative forms of recovery are speculative and loss models inherently unreliable, reliance damages can be ascertainable and fixed." *Id.* We proceed with a discussion of restitution, reliance, and mitigation as applied to the facts of this case, in light of these recent expressions of the appeals court's desired approach to resolving these cases.

## A. Restitution

The following issues arise in connection with restitution in this case: (1) did the contributions result from a legal obligation; (2) did the Government commit a "total breach;" (3) would an award to plaintiff result in a "windfall;" (4) did the Government receive a benefit that the law of restitution requires it to disgorge; and (5) were the goods "substantially altered" during performance.

█ Restitution is available in limited situations. "[W]e have allowed restitution for the limited purpose of returning the acquiring thrift to the status quo ante when specific initial contributions to an acquired thrift have been established." *Glendale*, 378 F.3d at 1313 (citing *Landmark*, 256 F.3d 1365 (Fed. Cir.2001)).[17] The Federal Circuit has suggested that restitution should be awarded in these cases cautiously. *See id.* at 1313, 1315. Restitution should restore the non-breaching party to its pre-contract status, not to its pre-breach status. *See Landmark* 256 F.3d at 1372 (citing *Glendale*, 239 F.3d at 1380). The damages awarded must be determinable and capable of being calculated reasonably, and they may not exceed an amount that would result in a windfall. The breaching party is entitled to an offset measured by the value of the benefit it has conferred on the non-breaching party, if applicable. *See Restatement (Second) of Contracts* § 374(1) (1981).

█ Defendant argued that the Assistance Agreement did not require that plaintiff contribute all of the holding company's stock in Old Stone to Rhode Island Federal. A party seeking restitution must show that its costs arose from requirements of the contract breached. "[P]laintiff's contribution must have been made in performance of its contractual obligations." *Landmark*, 256 F.3d at 1375. Plaintiff claims that this argument is based on semantics—an interpretation of the contract that is unwarranted and prohibited by explicit terms of the contract itself.

Defendant questioned whether the Government committed a "total breach" of contract by enacting FIRREA. "[R]estitution is 'available only if the breach gives rise to a claim for damages for total breach and not ... partial breach.'" *Hansen v. United States*, 367 F.3d at 1309 (quoting *Restatement (Second) of Contracts* § 373 cmt. a. (1981)).

> Not every departure from the literal terms of a contract is sufficient to be deemed a material breach of a contract requirement, thereby allowing the nonbreaching party to cease its performance and seek appropriate remedy. The standard of materiality for the purposes of deciding whether a contract was breached "is necessarily imprecise and flexible." The determination depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties.

*Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1550–51 (Fed.Cir.1992) (quoting *Restatement (Second) of Contracts* § 241 cmt. a and citing cmts. a & b (1981)); *see also Restatement (Second) of Contracts* § 243 cmt. e (1981) (Determination of total breach is made "in the light of all the circumstances, taking account of the difficulty of calculating damages for total breach and of any uncertainties that could be avoided if the

---

17. The trial court in *Landmark* drew a distinction between the initial contribution required by the contract and a later contribution that the contract did not require. *See Landmark Land Co. v. United States*, 46 Fed.Cl. 261, 267 n. 7 (2000), *aff'd in part, rev'd in part, vacated in part sub nom. Landmark Land Co. v. FDIC*, 256 F.3d 1365 (Fed.Cir.2001). The plaintiff acted voluntarily in the latter instance and did not qualify for restitution for that reason. This was an unusual fact situation. *See Glendale*, 378 F.3d at 1313. The Federal Circuit suggests that *Landmark* is limited to its facts. The appeals court encourages attorneys and trial judges to focus on reliance as a remedy. *See id.* at 1312–13

injured party were given a claim merely for damages for partial breach.").

Plaintiff's witnesses testified that obtaining additional regulatory capital was highly important to the transaction. (*See, e.g.,* Tr. at 148, 271, 733.) Counsel stated that the forbearances on the other hand "were not really of great economic consequence." (Tr. at 739.) Defendant challenges the credibility of plaintiff's witnesses on this point.

■ Restitution is not appropriate "where relief would result in an 'unfair windfall' to the non-breaching party." *Hansen,* 367 F.3d at 1315 (quoting *Restatement (Second) of Contracts* § 384 cmt. a (1981)). The appeals court suggested in *Hansen* that restitution damages should be awarded cautiously, to restore the non-breaching party to its pre-contract status and nothing more. *Id.* The damages awarded must not exceed a range that would create a windfall for the non-breaching party. Such a result would not return the non-breaching party to its pre-breach position, but to a better position. This would be a windfall.[18] "[T]he non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." *Id.* (quoting *Bluebonnet,* 339 F.3d at 1345). The *Hansen* decision does not provide a means to measure damages vis-a-vis potential windfalls.

The *Restatement* does not mention the windfall issue specifically. The court in *Coast–To–Coast Financial Corp. v. United States,* 60 Fed.Cl. 707, 711–12 n. 9 (2004), *amended by* 62 Fed.Cl. 469 (2004) (denying plaintiff's motion for reconsideration), offered some discussion of windfall, but noted that the majority in *Mobil Oil* did not seem concerned with a potential windfall for the oil companies in that case. In *Citizens Federal Bank, FSB v. United States,* the court suggests that windfall is an "unjust enrichment" as described in the *Restatement (Second) of Contracts. See* 59 Fed.Cl. 507, 524 (2004) ("[T]he reason post-judgment damages are discounted is so that damages accrued after the date of judgment would not result in a windfall or 'unjust enrichment' for plaintiffs.").

"When one party to a contract repudiates that contract, the other party 'is entitled to restitution for any benefit that he has conferred on the repudiating party by way of part performance or reliance.'" *Mobil Oil,* 530 U.S. at 608, 120 S.Ct. 2423 (citing *Restatement (Second) of Contracts* § 373 (1981)). Restitution is a party's "interest in having restored to him any benefit that he has conferred on the other party." *Restatement (Second) of Contracts* § 344(c) (1981). The comment following this definition explains that courts will grant restitution to prevent unjust enrichment. *Id.* at § 344 cmt. a. "Restitution is, therefore, available to a party only to the extent that he has conferred a benefit on the other party." *Id.* at § 370 cmt. a (citing *Restatement of Restitution* § 1 cmt. b (1937)). "The benefit may result from the transfer of property or from services, including forbearance." *Id.*

The *Restatement* precludes restitution when the non-breaching party cannot return "any interest in property that he has received in exchange in substantially as good condition as when it was received by him ...." *Id.* at § 384. If the non-breaching party has "used, destroyed or substantially altered in character" property received from the breaching party so that return is not feasible, "restitution is generally not available." *Id.* at § 384 cmt. a. Defendant argued that the Citizen's transaction is not appropriate for restitution because the bank was "substantially altered" while in the possession of the holding company. (Def.'s Post–Trial Br. at 33 n. 3.)

It was held as a separate subsidiary for one year and then merged in the operations of Old Stone Bank. It was sold in its entirety in May of 1990, four-and-one-half years after OSC had acquired it. During this time period, hundreds, if not thou-

---

**18.** Windfall is "an unexpected piece of good fortune." William Morris & Mary Morris, *Morris Dictionary of Word and Phrase Origins* 605 (1977). The phrase "[dates back] to medieval England, when commoners were forbidden to chop down trees for fuel.... [I]f a strong wind broke off branches or blew down trees, the debris was [considered to be] a lucky and legitimate find." *Id.*

sands, of business decisions were made; assets were sold; assets were purchased; and numerous financing decisions were made.

(*Id.*)

If we are to consider the possibility of restitution as a remedy at all, this rule cannot apply to these circumstances. The requirement that property obtained according to contract must be returned in the same condition for restitution is inappropriate for a transaction of this type, where commingling is "the inherent nature of the ... transaction ...." *Hansen,* 367 F.3d at 1318–19. The Federal Circuit noted in *Hansen* that

> stock is an asset with a monetary value, just like cash. If it is proper ... to reimburse the Hansens via restitution for their cash contribution, it would seem appropriate to do the same as far as the value of their stock is concerned. In short, we fail to see a compelling distinction between these two assets that would counsel us to allow restitution of the cash, but prohibit restitution of the stock.

*Id.* at 1317.

### B. Reliance

" 'Reliance is an ideal recovery in Winstar cases.' " *Glendale* 378 F.3d at 1313 (quoting Jon W., *Where The Rabbit Hole Ends: A Working Model For Measuring Winstar-Type Damages In The Federal Circuit,* 13 Fed. Cir. B.J. 657, 685 (2004)). Some damages are too attenuated or too speculative to qualify for award, however. The non-breaching party is entitled only to damages that are foreseeable. *Hadley v. Baxendale,* 9 Exch. 341 (1854), first established the rule that contract damages must be foreseeable to the parties at the time of contracting. Damages must be either "(a) injuries which will flow naturally from the breach in the ordinary course of events, [or] (b) injuries which arise from plaintiff's special needs or circumstances of which [the breaching party] has knowledge or reason to know." *Restatement (Second) of Contracts* § 351 (1981).[19]

Reliance does not require total breach; neither does the windfall defense apply. The burden of establishing that plaintiff would have suffered losses independent of the breach falls on defendant. *See American Capital Corp. v. United States,* 59 Fed.Cl. 563, 575 (2004); *see also Restatement (Second) of Contracts* § 349 (1981) ("the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that *the party in breach can prove with reasonable certainty* the injured party would have suffered had the contract been performed." (emphasis added)).

### C. Mitigation

Plaintiff argues mitigation damages as an alternative theory of recovery. Costs incurred in a reasonable but unsuccessful effort to avoid loss are recoverable as incidental losses. *Restatement (Second) of Contracts* § 350 cmt. h (1981). Incidental losses include such costs, irrespective of whether such efforts are successful. *Id.* at § 347 cmt. c. Defendant acknowledges that "costs incurred in mitigating the effects of a breach may be recoverable as damages," but cautioned that the recovery of such costs is "not without limits." (Def.'s Post-Trial Br. at 50 (citing *Restatement (Second) of Contracts* § 347(b) (1981)).)

> The *Restatement* sets out the limits:
>
> (1) Except as stated in Subsection (2), damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation.
>
> (2) The injured party is not precluded from recovery by the rule stated in Subsection (1) to the extent that he has made reasonable but unsuccessful efforts to avoid loss.

*Restatement (Second) of Contracts* § 350 (1981).

Plaintiff made every reasonable effort to mitigate its damages after the breach. Not

---

**19.** See *Restatement (Second) of Contracts* § 349 (1981) for a discussion of essential reliance, the actual outlay of funds essential to plaintiff's performance under the contract, and incidental reliance, which consists of costs incurred in preparation for collateral transactions that a party plans to carry out when the contract is performed.

only did it abide by the terms of the Net Worth Maintenance Stipulation, but also it filed Capital Plans and complied with the Capital Directive. At the regulators' direction, plaintiff improved the bank's capital ratios, but in the process stripped itself of most operating subsidiaries that were producing earnings. Mr. Rosati testified about cost-cutting efforts undertaken by management after the breach, which resulted in substantial savings.

Defendant argues that the $74.5 million downstreamed cannot be mitigation damages because Old Stone Corporation transferred the funds as part of its obligation under the Net Worth Maintenance Stipulation.[20] We are mindful of the Federal Circuit's direction in *Glendale*, however: "we remain optimistic that within the additional guidance and support given the trial court ... the remainder of the Winstar cases can be disposed of ... based on the particular facts of the case, and without further dispute over the theory on which damages may be calculated." 378 F.3d at 1313.

## III. PLAINTIFF'S CLAIMS

Plaintiff identified four claims during summary judgment proceedings that it considered to be qualified for *"Landmark-style"* restitution:[21] (1) $102.2 million for stock in Old Stone commercial bank that the holding company Old Stone Corporation contributed to the failing thrift, Rhode Island Federal; (2) $74.5 million that Old Stone Corporation downstreamed to Old Stone Bank, FSB as required by the Net Worth Maintenance Stipulation;[22] (3) $13.8 million cash contribution to Rhode Island Federal as required by the FDIC; and (4) $14.8 million cash contribution made to acquire another thrift, Citizens Federal Savings Bank. We denied plain-

tiff's motion for summary judgment, and plaintiff presented similar claims at trial using various legal theories of recovery. *Old Stone Corp. v. United States*, No. 92–647C (Fed.Cl. Mar.28, 2003).

### A. Stock Contribution

The holding company seeks return of the value of stock that it contributed to Rhode Island Federal in connection with the merger of the banks.[23] Plaintiff claims that the holding company transferred its stock in Old Stone Bank to Rhode Island Federal to recapitalize the thrift as required by the Assistance Agreement.[24] Plaintiff contends that this justifies an award of money-back restitution. Defendant argued at trial that plaintiff did not recapitalize the thrift and that the Assistance Agreement did not require plaintiff's contribution of stock. Defendant insisted that plaintiff's contribution was merely a "condition precedent" to the Agreement and that it was FSLIC that recapitalized Rhode Island Federal with its contribution of $9.55 million. Rhode Island Federal had a net worth deficit of $4.4 million after FSLIC made its contribution. Defendant questioned why FSLIC would demand that plaintiff contribute nearly $103 million in capital to fill a $4.4 million negative net worth.

Dr. Cone testified as an expert for the Government. His opinion was that the $103.2 million stock contribution did not capitalize Rhode Island Federal but supported Old Stone Bank. This capital would have been necessary to support the commercial bank at the 5.5% ratio required by FDIC. (Tr. at 1795.) Defendant argued that Rhode Island Federal's initial $13.9 million contribution of regulatory capital was sufficient to capitalize Rhode Island Federal at the 5.5% level, with $6.7 million left over to support the Old Stone assets. Thus, Dr. Cone be-

---

**20.** The Government stated during its argument against restitution that plaintiff performed under the Net Worth Maintenance Stipulation voluntarily.

**21.** *See Landmark Land Co. v. United States*, 46 Fed.Cl. 261, 267 (2000), *aff'd in part, rev'd in part, vacated in part sub nom. Landmark Land Co. v. FDIC*, 256 F.3d 1365 (Fed.Cir.2001).

**22.** Net worth maintenance stipulations often required institutions to maintain a bank's capital at

minimum levels where, as in the case of Old Stone Corporation, the institution otherwise would have no such liability.

**23.** The parties do not dispute the value of the stock; it was approximately $103 million.

**24.** This is the commercial bank stock that plaintiff transferred to Newco. Newco was a service company that had been organized to receive the stock on behalf of Rhode Island Federal.

lieves that Rhode Island Federal essentially contributed capital to Old Stone rather than the other way around.[25] He also stated that plaintiff's restitution claim does not account for the profit Rhode Island Federal generated for plaintiff after the acquisition. This included $60 million in dividends.[26]

The Federal Circuit addressed the potential value of a stock exchange recently. See *Hansen,* 367 F.3d 1297. The agreement in *Hansen* required that the Hansens contribute $1 million to Hansen Savings and exchange all of their stock for stock of Hansen Savings. A state law required that the bank exchange its shares for shares in the acquiree thrift, and the assistance agreement so provided. The trial court saw "no basis to find that the exchange of stock was a transaction that caused either a loss to plaintiffs or a benefit to defendant" according to the facts presented there. *Hansen,* 53 Fed.Cl. at 108. The Hansens were not "strictly 'performing' a duty set forth in the Assistance Agreement" by transferring the stock. *See Hansen,* 367 F.3d at 1307 (explaining the reasoning of the trial court). The "mere repetition of the requirement" in the FHLBB resolution that Hansen give up its shares did not "elevate it to a contractual term compensable by restitution." *Id.* The stock exchange did not diminish the Hansens' ownership because they retained a controlling interest in the surviving entity. The court ruled that a "contribution" would have required surrender of the Hansens' controlling interest. *Id.* The Circuit stated on appeal that

> stock is an asset with a monetary value, just like cash. If it is proper … to reimburse the Hansens via restitution for their cash contribution, it would seem appropriate to do the same as far as the value of their stock is concerned. In short, we fail to see a compelling distinction between

these two assets that would counsel us to allow restitution of the cash, but prohibit restitution of the stock.

*Hansen,* 367 F.3d at 1317. Regarding the state law requirement, the Circuit ruled that the requirement remained a condition of the contract. *Id.* That it also happened to be required under New Jersey law "did not negate the fact that the stock exchange was an explicit term of the Hansen's contract with the Government." *Id.* The Circuit added, "[t]he pivotal question … is whether an award of restitution would place the Hansens in an overall better position than if the breach of contract had not occurred." *Id.*

The appeals court found that transfer of stock in the circumstances presented could be a valuable benefit to the Government:

> The availability of restitution insofar as the [stock transfer] is concerned thus turns on whether the stock transfer is properly viewed as having conferred a "benefit" upon the government. *We think that it did.* … [T]here is no doubt that the merger was desirable from the FSLIC's point of view. By assuming the liabilities of [the failing thrift], the Hansens allowed the FSLIC to avoid the high cost of bailing out another insolvent thrift. At the same time, the investment of the … shares into Hansen Savings was an essential component of the merger. In these respects, the stock exchange "advanced" the government's "interests."

*Hansen,* 367 F.3d at 1316 (citing *Restatement (Second) of Contracts* § 371 (1981)) (emphasis added).

The Circuit emphasized the fact that the owners gave up incidences of ownership in the stock even if they did not lose its value entirely. *See id.* The *Hansen* court found that such limitations on rights of ownership

---

**25.** Dr. Cone's testimony was oddly vague and imprecise. His memory of the expert report that he offered was limited. During his deposition, Dr. Cone did not know which regulatory agency was responsible for examining federally chartered savings associations. "I don't recall" and "I would have to check" were frequent refrains throughout his deposition. (*See* Tr. at 1891–95.) He seemed only slightly more familiar with this case on the stand.

**26.** The Circuit has ruled that dividends are not credited to the Government in restitution unless they came from the Government. *Landmark,* 256 F.3d at 1373–74, ("[The] government's actions were simply not relevant to the dividends."). Here, the dividends (and the profits) were generated entirely by the bank. Dr. Cone was an ardent advocate for the Government's legal and factual positions.

can be significant in determining whether plaintiff has transferred "benefits" to the Government or incurred costs. 367 F.3d at 1315–17. The holding in *Hansen* regarding the value of a stock exchange may be distinguished in some respects from the exchange of stock in this case. The trial court's ruling came on a motion for summary judgment.

Plaintiff's contribution of stock with a value of $103 million was a benefit to defendant's insurance system. Plaintiff's downstream of $74.5 million helped support the bank and it benefitted the system as well. The parties did not explain fully how such contributions should be quantified, however. Plaintiff assumes a dollar-for-dollar benefit, while the Government contends that the value is zero. Defendant argued in its post-trial reply brief that *"no* witness testified that FSLIC or the FHLBB saw the transaction as a 'huge benefit.'" (Def.'s Post–Trial Reply Br. at 5.) This does not add much to the court's understanding of a complex topic. To say that the transaction was a not a "huge benefit" does not help us quantify the benefit any more than Dr. Cone's assertion that the value was "far less than $103 million" (Tr. at 1927).

Dr. Cone acknowledged that the $103 million was a "cushion" for FSLIC, that FHLBB saw this cushion as a benefit, that the transaction provided an immediate benefit, and that it saved the Government from spending money to resolve the Rhode Island Federal issue. (Tr. at 1936–41.) He testified that Old Stone Bank paid about $1.5 million per year in premiums to FSLIC. (Tr. at 1943.) He also acknowledged that Old Colony, another bidder at the same level of priority, failed within in a year of the Rhode Island Federal transaction. (Tr. at 2111–12.)

### B. Post–Breach Contributions

Plaintiff's witnesses and counsel spoke often of the holding company's surrender of perfect immunity from the obligations of the bank as a result of the Net Worth Maintenance Stipulation. The effect of the Stipulation was to pledge the Corporation's entire net worth to support the troubled bank. The regulators could have enforced the Net Worth Maintenance Stipulation before the breach as well as after, but until after the breach they had no reason to demand the infusion of capital. Old Stone Bank had been in compliance with its then-existing capital requirements before the elimination of its supervisory goodwill.

Old Stone Corporation downstreamed $75 million to Old Stone Bank pursuant to the Net Worth Maintenance Stipulation after breach. Plaintiff claimed during arguments on its motion for summary judgment that Old Stone is entitled to restitution for this amount because it was paid in response to a contractual obligation.[27] *See Landmark,* 256 F.3d at 1375; *Glendale,* 239 F.3d at 1379–80 ("[W]e have allowed restitution for the limited purpose of returning the acquiring thrift to the status quo ante when *specific initial contributions* to an acquired thrift have been established." (emphasis added)).

■ Restitution generally is not available post-breach. That is, the non-breaching party normally may not be awarded restitution for costs incurred after the breach. Performance by the non-breaching party post-breach is the act of a volunteer. The breaching party will have given him sufficient notice to suspend performance and to prevent additional losses. This accords with the duty to mitigate.

The Net Worth Maintenance Stipulation states that it was entered into by the parties in consideration of the Assistance Agreement; each was incorporated by reference into the other. Defendant breached the Assistance Agreement. By its own terms, the Net Worth Maintenance Stipulation survives the Assistance Agreement. Presumably, the survival provision relates to a voluntary termination of the Assistance Agreement rather than a breach, but this raises an issue that we need not decide to resolve this case.

27. Both net worth maintenance stipulations contained language requiring that capital be maintained "except to the extent the Bank Board has agreed to forbear from enforcement of such [FSLIC capital] regulations." (Pl.'s Exs. 135, 209.) The parties did not argue the effect of this language on plaintiff's obligations and we have not considered it.

The Government contended during its argument against restitution that plaintiff performed the New Worth Maintenance Stipulation voluntarily. The holding company had no obligation to maintain the bank's net worth absent the Net Worth Maintenance Stipulation. However, the Government conditioned its acceptance of plaintiff's Capital Plan on Old Stone Corporation's compliance with the Net Worth Maintenance Stipulation. Plaintiff had to fulfill its obligation under the Stipulation before the Government would sign off on the Capital Plan that plaintiff submitted for approval. (Tr. at 329–30.) The bank depended on approval of the Capital Plan to remain in business. (*Id.*)

In theory at least, Old Stone Corporation could have ceased performance of the Net Worth Maintenance Stipulation once the Government breached the Assistance Agreement by enacting FIRREA. Upon material breach of a contract, the non-breaching party has the right to discontinue performance of the contract and to seek redress in accordance with law. *Malone v. United States,* 849 F.2d 1441, 1445–46 (Fed.Cir.1988), *modified by* 857 F.2d 787 (Fed.Cir.1988); *Cities Serv. Helex, Inc. v. United States,* 211 Ct.Cl. 222, 234–35, 543 F.2d 1306, 1313 (1976). The holding company could have done this by not downstreaming capital to the subsidiary bank as required by the Net Worth Maintenance Stipulation. In practice, this is a problem that is exemplary of those described by the Federal Circuit in *Glendale.*

The Circuit commented that the "problem with which the trial court has had to wrestle has been finding a viable damages theory that fits the complex fact patterns of these cases, one that is fair to the damaged thrifts, but is based on real losses sustained so as not to overcompensate for the breach." *Glendale,* 378 F.3d at 1308. The appeals court directed that the we consider reliance damages in ruling on most *Winstar* cases. *Id.* " 'Reliance is an ideal recovery in Winstar cases.' " *Glendale,* 378 F.3d at 1313 (quoting Jon W. Burd, *Where The Rabbit Hole Ends: A Working Model For Measuring Winstar–Type Damages In The Federal Circuit,* 13 Fed. Cir. B.J. 657, 685 (2004)). " 'Despite the landscape where alternative forms of recovery are speculative and loss models inherently unreliable, reliance damages can be ascertainable and fixed.' " *Id.*

The principle of reliance is that a party who relies on another party's promise made binding through a contract is entitled to damages for any losses actually sustained as a result of the breach of that promise. *See Glendale,* 239 F.3d at 1382–83. The important aspect of reliance damages for the purposes of this case is that reliance damages are available for costs incurred both before and after the breach. The standard for reliance damages is not whether the expenditures were required under the contract, but whether the expenditures were made in reliance upon the contract. Plaintiff need show only that it spent money because of the contract. *Landmark* 256 F.3d at 1379; *Restatement (Second) of Contracts* § 344(b) (1981).

Defendant argued that Old Stone's losses "stemmed directly from its own decision to become heavily involved in international loans, investments in commercial real estate, and commercial real estate lending." (Def.'s Post–Trial Br. at 51.) This suffers from the same speculation and lack of proof described earlier. Defendant cannot blame Old Stone's demise on "a downturn in the economy" (*id.* at 52) when the regulatory capital for which the bank contracted was intended partly to shield the plaintiff from such losses. The bank had acquired $95 million of regulatory capital through its mergers with Rhode Island Federal and Citizens. This was thirty-five percent of its total capital. (Tr. at 1213–14.)

Defendant states that "because OSC had entered into a binding net worth maintenance [stipulation], it was obligated to make the infusions of capital ... without the breach" (Def.'s Post–Trial Br. at 36), apparently meaning that the contributions were not required by the Assistance Agreement. Plaintiff would not have had reason for the infusions absent the elimination of the bank's regulatory capital by FIRREA.

Plaintiff had two options after FIRREA's passage, according to defendant:

It could either have terminated the agreement and claimed entitlement to restitution ... or it could have continued to perform under the agreement and sought damages for partial breach. Plaintiff chose the latter option. Having made that choice to continue under the agreement, plaintiff may not now claim restitution. The facts of this case demonstrate why allowing it to do so *would be so unjust.* (Def.'s Post–Trial Br. at 39 (emphasis added).) The irony of this argument, however, is that plaintiff's continued performance, the "latter option," was its compliance with the Net Worth Maintenance Stipulation—apparently under some duress.[28] It is difficult to understand defendant's argument that a contribution of $74.5 million to an entity guaranteed by the United States "would be so unjust."

### C. Citizens Federal Contribution

Old Stone Corporation purchased Citizens Federal, a troubled thrift institution in Seattle, Washington as of December 27, 1985. Citizens had a net worth deficit of over $30 million and substantial unrealized losses. The cost of liquidating the bank was estimated at $92 million. The Assistance Agreement among FSLIC, Old Stone Corporation, and Citizens Federal (Pl.'s Ex. 209) required FSLIC to make a cash contribution of approximately $79 million for the acquisition and called for various other forms of assistance and forbearances. The FHLBB approved the proposal in part because it was the best offer and it cost less than liquidation.

The Agreement provided that Old Stone Corporation would contribute cash equal to three percent of its total assets, or $14.8 million at the time. Old Stone changed the name of Citizens Federal to Old Stone Bank of Washington and sold it several years later for a $9.5 million pre-tax profit. This claim represents a pure example of money-back restitution, where the contract required plaintiff to contribute three percent of its capital or $14.8 million to purchase a failing thrift, Citizens Federal. *See Landmark,* 256 F.3d at 1375 (For restitution, "plaintiff's contribution must have been made in performance of its contractual obligations."). The parties did not argue the legal effect of the profit to any extent during trial. Defendant's brief asserts that evidence "established that during its ownership of [Old Stone Bank of Washington], [Old Stone Corporation] obtained a 40 percent return on its investment." (Def.'s Post–Trial Br. at 57.) If defendant derived this number merely by dividing $14.8 million by $9 million, Dr. Cone testified that none of the profits found their way to the holding company, which is the plaintiff in this action.[29] (Tr. at 1980–81.) Defendant's other comment on the issue is that "OSC has presented no evidence showing it was in any way harmed by the sale" of Citizens Federal. (Def.'s Post–Trial Br. at 57.)

Plaintiff sold Old Stone Bank of Washington because it had to raise capital. This came during the period of "shrinkage" that is discussed elsewhere in this Opinion. Banks make money through returns on assets, or earnings. Mr. Rosati explained that bank operations are different from those of other businesses or of household accounts, where paying down liabilities results in increased cash flow because less money does to paying principal and interest.

Mr. Rosati explained further:

[B]anks will take deposits or borrow money, which are called liabilities, and then take those liabilities and then lend them

---

**28.** Several witnesses for plaintiff testified about their concerns that regulators would assess penalties and take other enforcement actions including the issuance of cease and desist orders to enforce the capital plan and indirectly the Net Worth Maintenance Stipulation. (*E.g.,* Tr. at 1014–15.) The total capital downstreamed by the corporation to the bank was $74.5 million, an amount not in dispute. The amounts were $45.463 million in 1990; $27.5 million in 1991; and $1.6 million in 1992. (Tr. at 315.)

**29.** Dr. Cone testified that none of the money paid to the bank for the sale of Old Stone Bank of Washington was "dividended" to plaintiff holding company. (Tr. at 1980–81.) Thus, plaintiff did not have the benefit of the profit or the earnings. Presumably what was left of the benefits from that sale went to the Government when it seized the bank in 1993.

out and make loan[s] .... And the bank makes money by the spread between the cost of the liabilities and the [income from] the loan. Now, the problem you have is that if you continue to shrink by selling your assets to pay off your liabilities ... you cross over because the bank has fixed operating expenses.... [Y]ou can finally shrink yourself out of existence, because you will have no liabilities but you [also] will have no assets.... [A]ll you'll have is fixed overhead and you'll fail.

(Tr. at 2386–87.) Mr. Rosati testified that the bank had approximately $3.4 billion in total assets at its peak. (Tr. at 2388.) The total after shrinking was about $1.8 billion. (*Id.*) He testified that this had a material effect on the bank's operations. (*Id.*) He said, "once you sell your subsidiaries and you shrink the size of the balance sheet you put yourself in a position where you cannot leverage your liabilities into assets, where you cannot generate a profit." (*Id.*) This is not a lost profits case, so the effect of shrinkage is not a major issue in determining damages, but it addresses the notion that plaintiff was not harmed by shrinkage.

The Circuit has approved restitution damages in limited fact situations, particularly where the contribution is a clear, contractual requirement. *See, e.g., Glendale*, 239 F.3d at 1381 ("[W]e have allowed restitution for the limited purpose of returning the acquiring thrift to the status quo ante when *specific initial contributions* to an acquired thrift have been established." (citing *Landmark*, 256 F.3d at 1365) (emphasis added)). Defendant argued that the Assistance Agreement in this case did not require plaintiff to make the stock contribution. Such a requirement would be necessary not only for restitution but also to compensate plaintiff according to a reliance theory for purposes of the foreseeability analysis. *See, e.g., Landmark*, 256 F.3d at 1375, 1378–79. Implicit in the Government's argument is the notion that the Agreement's terms were not negotiated in the sense that government officials had a real stake in the outcome. Defendant suggests that all the regulators wanted was to buy time, and that the entire process was plaintiff's way of reorganizing its corporate struc-

ture. See *Hansen*, 367 F.3d 1297 (Fed.Cir. 2004), and our discussion below.

Defendant pointed out that the provision requiring plaintiff to transfer its stock in the bank to Rhode Island Federal is a part of the *Recitals* of that Assistance Agreement (Pl.'s Ex. 135), while required capital contributions are in the *Agreement* portion. The *Summary of Substantive Provisions* at the beginning of the contract lists FSLIC's cash contribution of $9.5 million to Rhode Island Federal but not a $102.2 million contribution of stock by plaintiff. Defendant believes this establishes that only the $9.5 million that FSLIC contributed to the thrift was meant to recapitalize the thrift.

The requirement that plaintiff transfer stock of its commercial bank subsidiary may be found both in the *Recitals* and in the *Conditions* section of the *Agreement* portion. The *Recitals* include the following:

D. On the Effective Date, *HOLDING COMPANY will make a capital contribution of all of the stock of [the commercial bank,] to a newly formed, wholly owned, first tier service corporation of [Old Stone Bank,] FSB[, Newco].*

E. On the Effective Date, [the commercial bank] will transfer substantially all of its assets, except assets relating to certain trust operations of [the commercial bank], to [Old Stone Bank,] FSB, and [Old Stone Bank,] FSB will assume substantially all of the liabilities of [the commercial bank].

F. *In consideration of the mutual promises contained in this Agreement, the parties enter into the following agreement.*

(Pl.'s Ex. 135 at 2 (emphasis added).) The *Agreement* portion appears next with § 1, "*Definitions*," and § 2, "*Conditions*." Subsection (a) under *Conditions* states:

The obligations of the parties under this Agreement are subject to the occurrence of the following: ... [*inter alia*] [t]he transfer of all of the issued and outstanding stock of [the commercial bank] by *HOLDING COMPANY to Newco, a Rhode Island corporation, which shall be a whol-*

*ly owned, first tier, subsidiary of [Old Stone Bank,] FSB.*

(Pl.'s Ex. 135 at 4 (emphasis added).) The language in the *Agreement* portion characterizes the contribution as a "condition." The *Conditions* section states that "[FSLIC]'s obligations ... are ... conditioned upon the execution and delivery of a Dividend Limitation Stipulation and a Net Worth Maintenance Stipulation ...." [30] (Pl.'s Ex. 135 at 7–8.)

The Assistance Agreement for the Citizens Federal acquisition (Pl.'s Ex. 209) provides an important contrast to the Agreement for Rhode Island Federal (Pl.'s Ex. 135), according to defendant. The *Recitals* sections in each end with an identical Paragraph F: "[i]n consideration of the mutual promises contained in this [Assistance] Agreement, the parties enter into the following agreement." As in the Rhode Island Federal Assistance Agreement, the *Agreement* portion of the Citizens Federal Assistance Agreement begins with § 1, "*Definitions,*" and § 2, "*Conditions.*" Section 3, "*Contributions by [Old Stone Corporation],*" however, is listed under *Conditions.* Section 3 provides that "OSC shall contribute cash to FSB in an amount equal to 3% of FSB's total assets ...." (Pl.'s Ex. 209 at 8.) The section explains how the contribution will be calculated and where the money will be wired. The following section, "*Contributions by [FSLIC],*" sets out the amount and timing of FSLIC's cash contributions, its indemnification contributions, and contributions resulting from assignment of acquired claims.[31] (Pl.'s Ex. 209 at 9–11.)

The two Assistance Agreements entered into by essentially the same parties at about the same time, are markedly different in the important respect of plaintiff's obligations to make capital contributions, according to defendant. No mention is made of the $103 million stock transfer in the *Contributions* section of the Rhode Island Federal Assistance Agreement. This section contains only FSLIC's cash contribution. The Citizens Federal Assistance Agreement, in contrast, lists both parties' contributions.

Plaintiff characterizes such arguments as semantics and points out that the court may not use captions to construe the contract. (*See* Pl.'s Exs. 135 § 16(c) at 26, 209 § 19(c) at 34–35 ("Section headings are not to be considered part of this Agreement ... and shall not affect the meaning or interpretation of this Agreement or any of its provisions.").) It is not clear whether the contract rule against considering section headings applies to defendant's arguments on this point, but we do not think it necessary to decide that issue.

The initial contribution of stock and assets was required of plaintiff to give the contract effect. The same is true of plaintiff's obligation to deliver the Dividend Limitation Stipulation and the Net Worth Maintenance Stipulation. These provisions were consideration to the Government, and they were central to the agreement. No other sections of the Assistance Agreement require Old Stone Corporation to perform; all obligations are in the *Recitals* or the *Conditions.* Whether the requirements were terms or conditions, the parties responded initially and abided by the provisions until the breach. "[W]hen parties enter into a contract, each and every term and condition is in consideration of all the

---

30. A partial list of actions required by the contract that also are included under the *Conditions* section of the *Agreement* portion follows:
- Purchase of all Old Stone Bank, FSB stock by the Holding Company
- Transfer of all of the commercial bank's stock to Newco
- Transfer of all assets of the commercial bank to Old Stone Bank, FSB
- Plaintiff's agreement to restrict Old Stone Bank, FSB's operations
- Delivery of legal opinions from counsel for Old Stone Bank, FSB
- Delivery of legal opinions from counsel for the Holding Company
- Delivery of legal opinions from counsel for the commercial bank
- Delivery of legal opinions from counsel for Newco
- Delivery of Corporate Resolutions approving all transactions
- Delivery of a Dividend Limitation Stipulation
- Delivery of a Net Worth Maintenance Stipulation

(Pl.'s Ex. 135.)

31. FSLIC also gave Old Stone Bank of Washington an option to sell a troubled loan from Citizen Federal to Bay Vista Condominiums for $14 million cash. The option was good for 60 days.

others, unless otherwise stated." *Stone Forest,* 973 F.2d at 1552. "Unless justice so requires, courts should hesitate to rewrite a contractual arrangement after a material breach by one party . . . ." *Id.*

A resolution of the Federal Home Loan Bank Board approving Old Stone's acquisition of Rhode Island Federal (Pl.'s Ex. 107.) is a part of the contract in this case. The Resolution's purpose was to approve the supervisory conversion of Rhode Island Federal to a Federal Stock Savings Bank and plaintiff Old Stone Corporation's acquisition of the resulting stock.[32] The FHLBB Resolution includes the following provision:

> [T]he conversion of [Rhode Island Federal] from a federally-chartered mutual savings and loan association into a federally-chartered stock savings bank, to be called Old Stone Bank, a Federal Savings Bank, is hereby approved, *provided* that: . . . *Old Stone Corporation has contributed its stock in [the commercial bank] to Newco* . . . .

(Pl.'s Ex. 107 at 3–7 (second emphasis added).)

### D. The FDIC Assessment

Old Stone was a commercial bank before the merger and thus insured by the Federal Deposit Insurance Corporation. The FDIC's policy at the time was to require banks leaving the Fund to meet capital ratios required of commercial banks. *See* 12 U.S.C. § 1828(c) (authorizing the FDIC to approve transfer of commercial bank assets out of the Fund). Old Stone initially claimed restitution for the $13.8 million cost of increasing the bank's capital ratio to 5.5 percent before it was permitted to leave the FDIC's fund. Plaintiff essentially abandoned the claim, however, near the end of trial.

The Assistance Agreement between Old Stone and FSLIC includes a requirement that plaintiff obtain "[s]uch approvals by the Federal Deposit Insurance Corporation of the foregoing transactions as are legally necessary."[33] (Pl.'s Ex. 135 at 5.) The FDIC imposed the obligation to improve the bank's capital ratio to a minimum 5.5 percent as consideration for Old Stone Bank's leaving the FDIC's insurance fund. This accorded with FDIC policy at the time apparently. Plaintiff agreed to that requirement at least a month before signing the contract with FSLIC, presumably because the FDIC could have prevented plaintiff's reorganization as a federal savings bank. *See* 12 U.S.C. § 1828(c). The contribution was made in connection with the overall transaction, which would not have been approved absent plaintiff's acquiescence. Plaintiff offered no evidence concerning the claim during trial, however, and advised the court later that it would abandoned the claim.

## IV. DEFENDANT'S ARGUMENTS

Defendant argued that if the Government had not seized the bank, "there is no basis to conclude that it would have survived or been profitable in the future." (Def.'s Post–Trial Br. at 35.) There was no evidence that any of the attempts of Mr. Rosati to save the bank would have been successful in the non-breach world or that anyone would have

---

**32.** The Federal Home Loan Bank Board was authorized to convert a mutual institution into a stock institution or a federal stock savings bank in certain circumstances. For example, it could permit such a conversion "if the Board has determined that severe financial conditions exist which threaten the stability of an institution and that such authorization is likely to improve the financial condition of the institution . . . ." 12 U.S.C. § 1464(p)(2). That occurred in this case. Rhode Island Federal, a federal mutual savings and loan association, became a federal stock savings bank.

**33.** Plaintiff questioned whether FDIC had the authority to demand a contribution to capital before leaving the Fund. However, Old Stone Bank's September 1984 application to the FDIC to transfer its assets to Rhode Island Federal, contains the following representation:

> This transaction has been structured so that the resultant institution would be a federal savings bank insured by the Federal Savings and Loan Insurance Corporation. While the resultant federal savings bank would have a pro forma tangible adjusted capital ratio somewhat below the level the Corporation considers acceptable for an institution of this size, *Old Stone Bank has committed to raise sufficient additional equity capital by December 31, 1985 so that the resultant institution will have a tangible adjusted equity capital to assets ratio of at least 5.5 percent.*

(Def.'s Ex. 18 at 4 (emphasis added).)

come to the bank's assistance. (*Id.*) However-er, defendant's doubts are speculative.[34] Defendant did not establish that the bank would have failed regardless. If it had made such a showing, defendant also should have shown what the effect on the holding company would have been. Old Stone Corporation is the plaintiff here.

The Government did not prove the losses that plaintiff would have suffered absent the breach. It would have been difficult for defendant to make such a showing in the "but for world," as demonstrated in plaintiffs' lost profits cases here. See, for example, *West-fed Holdings, Inc. v. United States,* 55 Fed. Cl. 544, 558–60 (2003) (granting reliance damages to holding company plaintiff and refusing to offset such reliance damages because the Government failed to prove with reasonable certainty that the holding company would have suffered losses absent the breach), where government experts did not develop a model to support their views of what losses the thrift would have incurred in the but for world of no breach.

We think it highly unlikely that the regulators would have seized the bank in 1993, absent the breach. A memorandum from Mr. Peckham to Mr. Vigna dated December 4, 1992 stated,

> [f]or the first 9 months of 1992, and before provisions for credit/REO losses, OSB earned $9.5 million compared to a loss of $18.1 million for the same period in 1991. Of the $28 million in improvement, $6 million is due to spread improvement, $7.2 million to improved non-interest income and $14 million to reduced non-interest expense. This trend demonstrates that core earnings power is being restored....

(Pl.Ex. 504 at 6.) The bank was profitable on an operating basis in December 1992 and January 1993. (Tr. at 1988.) Plaintiff presented evidence that the bank would have had more than $65 million in regulatory capi-

tal on the books at seizure had the Government not breached its contract.

Dr. Cone testified that a damage award of "over $200 million" would result in a windfall because it would make Old Stone Corporation better off than without the breach. (Tr. at 1773.) This is because the losses "were not caused by the breach," but "were caused by [the bank's] own strategy." (Tr. at 1882–83.) This testimony was not credible. Dr. Cone was critical of the bank's portfolio and its policies in general. These problems resulted in part because of general economic conditions at the time. Such problems would have been eased by the bank's having had a capital cushion. Old Stone acknowledges that factors other than the breach affected the bank's operations during the period after the breach. Plaintiff argues, however, that it would have survived with the benefit of the capital cushion provided by the regulatory capital for which it contracted. We believe this is so. Credible evidence and testimony offered during trial support this finding.

Expert witnesses in some *Winstar* cases have argued in effect that the Government did the banks a favor by breaching their contracts. Here, government counsel states that the bank would have been "in a more precarious capital position absent the breach" because it would have had the same bad assets and losses that were unrelated to the breach. (Def.'s Post–Trial Br. at 33.) The meaning of this argument is not clear, but defendant did not prove it in any event.

Defendant argues essentially that plaintiff did not need the regulatory capital and the various types of assistance in the Assistance Agreement and did not negotiate for them. Defendant suspects that all plaintiff wanted was a thrift charter. See *Landmark,* 256 F.3d at 1374–75 (barring compensation for "strategic business decisions not fairly attributable to the agreement with the government."). Plaintiff acknowledged that it wanted a thrift charter. Its witnesses testified at

---

34. For example, government counsel argued as follows during trial:

> [T]he *inference* is, in the nonbreach world, they would be in the exact same place; and the [Office of Thrift Supervision] would have taken the exact same steps.... [Old Stone Corporation] would have had to downstream capital to

> try to keep the bank alive. [It] *would have probably* had to sell off [its] subsidiaries to solve the commercial paper problem because [it] would have been in the exact same, if not worse, position.

(Tr. at 2857 (emphasis added).)

length about the importance of moving beyond the state of Rhode Island. (*E.g.*, Tr. at 258, 734.) Such testimony does not detract from the fact that the capital provisions and the forbearances were "clear and explicit condition[s] of the contract between the parties." *Hansen*, 367 F.3d at 1317. The Government argued in *Hansen* that it was not responsible for returning the value of plaintiff's stock as restitution because the Hansens had a legal duty under state law to transfer or reissue the stock anyway. *Id.* The Circuit stated that

> [t]he exchange of stock constituted the performance of a clear and explicit condition of the contract between the parties. The fact that it also happened to be required under New Jersey law does not negate the fact that the stock exchange was an explicit term of the Hansens' contract with the government.

*Id.*

Dr. Cone stated that "all of the divestitures [by Old Stone Bank] would have been required by the end of 1992, even without the breach ...." (Tr. at 1874.) This takes into account the 1992 write-off for losses. The Government argued that this meant that "because OSC had entered into a binding net worth maintenance [stipulation], it was obligated to make the infusions of capital [it] made even without the breach." (Def.'s Post–Trial Br. at 36.) This testimony begs the question. Had there been no breach, plaintiff would not have been required to make contributions pursuant to the "binding net worth maintenance [stipulation]." Dr. Cone did not offer credible evidence for such sweeping testimony. Similarly, government counsel argued, if OSB had not been seized, "there is no basis to conclude that it would have survived or been profitable in the future." (*Id.* at 35.) This is not the standard, however. Defendant has the burden of proof on this point. *See Restatement (Second) of Contracts* § 349 (1981). It did not show that the losses would have occurred anyway.

Defendant highlighted Mr. Rosati's testimony that "[t]he breach had nothing to do with the fact that the real estate markets went soft, [it] had nothing to do with the fact that there were losses inherent in Old

Stone." (Tr. at 2495.) His next comment is important as well: "[w]hat the breach did was [take] away our ability to weather the storm, to solve the problems" (Tr. at 2495–96). Regulators who testified were complimentary of plaintiff's management and its efforts to use creative means to save the bank. (*See, e.g.*, Tr. at 1343, 1361.) The bank would have been in full capital compliance but for the breach; that is, adding the regulatory capital back to its balance sheet after breach. The corporation's contributions pursuant to the Net Worth Maintenance Stipulation would not have been necessary.

Defendant's argument that Old Stone's losses "stemmed directly from its own decision to become heavily involved in international loans, investments in commercial real estate, and commercial real estate lending" (Def.'s Post–Trial Br. at 51) suffers from the same speculation and lack of proof described earlier. The Government cannot blame Old Stone Bank's demise on "a downturn in the economy" (*id.* at 52) when the regulatory capital for which it contracted was intended in part to shield plaintiff from such losses.

### A. Foreseeability

Plaintiff's loss must have been foreseeable to defendant at the time of contract formation for plaintiff to recover reliance damages. Defendant argues that the Government must have foreseen both the magnitude and the type of damages and that it had no reason to foresee that plaintiff would lose its entire business as a result of the breach. Plaintiff relies on *American Capital*, which holds that

> the Government is not required to know, or even suspect, that a loss would be caused by ... FIRREA, only that the Government foresaw, at the time the Assistance Agreement was made, the amounts that were being placed at risk and could be lost, regardless of the actual cause of the loss.

59 Fed.Cl. at 576.

Old Stone Bank was $75 million short of its capital requirements after the breach. This was a wholly foreseeable consequence of the enactment of FIRREA. It was also foresee-

able that regulators subsequently would demand that Old Stone Corporation prop up its failing subsidiary with infusions of capital once Old Stone Bank fell short of its capital requirements. The regulators had every reason to pursue Old Stone Corporation given the leverage with which the Net Worth Maintenance Stipulation provided them. This was a function of their regulatory authority.

The Government argued, "[e]ven if OSB had not been seized, assuming there had been no breach, there is no reason to conclude that the losses for which OSC is seeking damages would not have occurred anyway." (Def.'s Post Trial Br. at 48.) Defendant must show more than the bank *might* have incurred the same losses. We concluded that the bank would have survived despite the breach, given more time.

## B. Causation

■ Reliance damages not only must have been foreseeable but also plaintiff must show that they were caused by the breach. *Restatement (Second) of Contracts* §§ 351–52 (1981). Old Stone Corporation downstreamed $74.5 million because of the Government's breach. This expense was the result of plaintiff's obligation under the Net Worth Maintenance Stipulation, so it was certainly foreseeable. Old Stone Corporation had no reason to sell its profitable holdings and sink the resulting capital into the by then troubled Old Stone Bank except for the capital shortfall caused by defendant's breach. Likewise, regulators would have had no reason to implement the Capital Directive absent FIRREA because Old Stone Bank would have been in capital compliance. The $74.5 million downstream was a direct result of the breach.

## C. Calculation

Damages must be reasonably capable of calculation. *Restatement (Second) of Contracts* §§ 351–52 (1981). The amounts that Old Stone Corporation downstreamed after the Government's breach are capable of calculation. They were not disputed at trial. None of the other amounts claimed was dis-

puted at trial. We dismiss the FDIC assessment by this Order and Opinion.

## D. Benefit to the Government

Defendant challenges the notion that plaintiff conferred a benefit upon the Government because at all times before and after the merger FSLIC guaranteed the deposits in the federal savings bank. The Federal Circuit made his point in the first *Glendale* case: "It is important to remember that, even after [the] merger . . ., the Government was not free of potential liability for the failing thrift. Had interest rates not come down . . . [and had the thrift] failed, the Government's contingent liability would have matured . . . ." *Glendale*, 239 F.3d at 1382. However, the trial court had ruled that restitution damages could be based on the value of goodwill lost by the impact of FIRREA. *See id.* at 1381. The Federal Circuit held that damages could not be measured in terms of "a liability that never came to pass, and based on a speculative assessment of what might have been . . . ." *Id.* at 1382. This is not authority for defendant's argument that the Government obtained no value from the contract.

Dr. Cone attempted to assert that plaintiff's participation in the Assistance Agreement was neither a cost to plaintiff nor a benefit to the Government. He acknowledged on cross-examination, however, that plaintiff's stock contribution was a benefit to the Government "to the extent that Old Stone [Corporation] had other assets that could be used to support the bank . . . ." (Tr. at 1927.) He did not attempt to quantify the benefit to the Government, which of course is a key issue in this case.[35] (Tr. at 1926–29.)

Defendant states that plaintiff's primary motivation in entering the contract was to obtain a thrift charter. Defendant's argument is that the Government did not benefit because plaintiff essentially gave the money to itself in a corporate reorganization. Expenditures made for business reasons unrelated to any duty of performance under the Assistance Agreement are not recoverable as reliance damages. *Landmark*, 256 F.3d at 1375; *Tangfeldt Wood Prods., Inc. v. United States*, 733 F.2d 1574, 1577 (Fed.Cir.1984)

---

**35.** *See* excerpts from Transcript *infra* pp. 55–57.

("In the terminology of the Restatement of Restitution, that benefit was 'officiously conferred' on the Government, and restitution is not owing." (citing *Restatement (Second) of Restitution,* § 2 and illus. 2 (Tentative Draft No. 1, 1983))).

Plaintiff exchanged the commercial bank's stock for that of the new bank. The Court of Appeals for the Federal Circuit addressed this issue in *Hansen. See* 367 F.3d at 1316. The Hansens filed a restitution claim for the value of stock they exchanged for stock in the resulting savings bank pursuant to the assistance agreement. While the transfer "did not require a surrender of ownership, it did require a surrender of control," the court ruled. *Id.* at 1317 n. 14. Plaintiffs contributed their stock to a risky venture based on the Government's guarantees under the agreement. The court underscored the Government's promise regarding supervisory goodwill, finding it central to the success of the subsequent savings bank. *Id.* "[T]he merger should be viewed as a *contribution* of stock to a joint and risky venture, rather than as an *exchange* of shares between two entities [both] owned by the Hansens." *Id.*

The Government's post-trial briefs include a number of conclusory arguments concerning the nature of plaintiff's losses and their causes. Defendant notes at one point, "it is uncontested that these losses were unrelated to the enactment of FIRREA or the inability of Old Stone to count the goodwill created as the result of the RIF in Citizens' transactions as regulatory capital." (Def.'s Post–Trial Br. at 55.) This is not at all uncontested. While it is true, as defendant points out, that "goodwill could not absorb real economic losses" (*id.*), goodwill used as regulatory capital could have prevented the Net Worth Maintenance Stipulation from coming into play.[36]

Defendant states that the $74.5 million in post-breach contributions were not made to mitigate the breach but they were "required

because OSB's capital rapidly was being depleted due to the serious deterioration of its asset quality and other non-breach related losses." (*Id.* at 51.) In fact, they were required because defendant enforced the Net Worth Maintenance Stipulation. Defendant cannot show that plaintiff's mitigation efforts were unreasonable when it required those very efforts through the Net Worth Maintenance Stipulation. The regulators demanded that the corporation mitigate the effects of the breach on the bank by downstreaming funds totaling $74.5 million. One of the government regulators agreed with plaintiff's counsel that "very, very large civil penalties" were available to the Government for those who did not cooperate, though he noted that "there were all sorts of conditions." (Tr. at 1018.) It wasn't something that was ... easily done nor should it have been easily done." (*Id.*)

Defendant questioned in post-trial briefs why plaintiff agreed to the Rhode Island Federal transaction given the concerns that Mr. Rosati and others expressed at trial.[37] For example, counsel cited Mr. Rosati's testimony that the Rhode Island Federal transaction "did not involve a large amount of capital and, standing alone, OSC never would have signed the net worth maintenance stipulation for RIF." (Def.'s Post–Trial Reply Br. at 3 (citing Tr. at 2487–89).) The same question occurs to one reading defendant's own briefs. Defendant stated that

> [Dr. Cone] made clear that the insurance premiums were only half of the equation, and one could not ignore that FSLIC also assumed insurance liability for the $2 billion *risky institution* that OSC merged into RIF, and for which it previously had no insurance liability.... [T]here was *no benefit to the Government from this business reorganization* which resulted in an undercapitalized commercial bank with *$2 billion of risky assets,* for which the Government, through the FDIC, carried de-

---

**36.** Defendant's post-trial briefs rely heavily on Dr. Cone's testimony and conclusory remarks in general. Some of Dr. Cone's key testimony was not credible for reasons stated in this Opinion.

**37.** Defendant also questions why FSLIC would demand that plaintiff contribute nearly $103 mil-

lion in capital to fill a $4.4 million negative net worth. One answer is that Rhode Island Federal had a net worth deficit of $4.4 million before the transaction. After the transaction the bank was in capital compliance.

posit insurance liability, becoming a thrift institution with those same $2 billion in risky assets, and for which the Government, through the FSLIC, continued to maintain deposit insurance liability. (*Id.* at 5 (emphasis added).) The important point is that the parties negotiated this contract and presumably they had every intention of complying with its provisions when they signed it. Moreover, the parties thought that this plan would work and that it would benefit both sides.

Government regulators stated that Rhode Island Federal was insolvent before the Assistance Agreement was signed, and that its acquisition by Old Stone would "lessen the risk" to the insurance fund. (Pl.'s Ex. 107 at 10.) FHLBB certified that plaintiff's proposal for acquiring Rhode Island Federal, a failing institution, "present[ed] the lowest expense and least risk to the FSLIC of any proposal submitted by a depository institution." (*Id.* at 11.) These statements were made pursuant to statutes authorizing such transactions, so we must assume that they were true when made.

FSLIC insured a bank with a negative net worth of over $4 million before the merger and after the Government's $9 million contribution. After the merger, the same bank had a positive net worth, including stock with a market value of over $100 million. It had liabilities to accompany those assets, but defendant did not offer a means of accounting for that circumstance during trial. Defendant presumptively benefitted because its insurance fund had access to more capital the day after the transaction was performed than it did the day before. It also gained access to the holding company's assets through the Net Worth Maintenance Stipulation. Dr. Cone made no effort to calculate the benefits of plaintiff's contributions under the Net Worth Maintenance Stipulation to the Government or the Stipulation's cost to plaintiff. (Tr. at 1926–28.) He testified eventually that the Stipulation was a cost to plaintiff and a benefit to the Government, but he did not know how much cost or how much benefit. (Tr. at 1922–26.) This was not useful expert testimony. Dr. Cone's expert testimony did not always meet the required standards of "reliability and helpfulness." *See, e.g., Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Fed.R.Evid.* 702.

Dr. Cone acknowledged on cross-examination that plaintiff's contribution of stock to Rhode Island Federal was a benefit to the Government, but he had not calculated that benefit either. He testified only that "[t]here is no way that the costs could have remotely been anything like $103 million." (Tr. at 1927.) He had no idea what the costs would be if not $103 million. These and similar comments that he made during trial did not bolster the court's confidence in his credibility. This is an excerpt of Dr. Cone's testimony on this issue:

Q. ... [P]rior to the execution of the net worth maintenance [stipulation], Old Stone Corporation was not contractually liable for capital calls made against Old Stone Bank, correct?

A. Yes, that's right.

Q. *Is there a cost to a corporation such as Old Stone Corporation of surrendering its immunity from capital calls and pledging its entire net worth to support its subsidiary?*

A. *Yes.* There would be a cost ... in general, yes.

Q. So that would be a cost to Old Stone Corporation, correct?

A. *Yes, I think entering into the net worth maintenance [stipulation] would represent a cost, yes.*

Q. And in delivering your opinions in this case, have you attempted, Dr. Cone, to quantify those costs?

A. No.

Q. *Have you attempted to develop an equation or a formula or a calculus to allow you to quantify the extent of the costs to which Old Stone Corporation was subjected when it acquired the supervisory thrifts at issue in this litigation?*

A. *No.* I think I could make a general statement that *it would be far less than 103 million,* but other than that I haven't tried to quantify it.

Q. But you are kind of *shooting from the hip* with that general statement because you really haven't come up with a formula or calculus, you can't quantify it in any definite sense sitting here today, correct, sir?

A. Well, that's correct, but I'm not shooting from the hip in that observation. There is no way that the costs could have remotely been anything like 103 million.

Q. But you don't know what the cost was, correct?

A. No, I haven't tried to quantify the costs that's correct.

Q. ... And at the time that Old Stone Corporation incurred this unquantifiable cost, *did that cost deliver a benefit to the Government?*

A. *Yes.* That element of the transaction would have been a benefit to the Government, to the extent that Old Stone [Corporation] had other assets that could be used to support the bank, yes.

Q. *And you haven't attempted to quantify that benefit to the Government either as you sit here today, correct, Dr. Cone?*

A. That's correct. Aside from the observation that it is *not remotely $103 million.*

Q. ... [S]o when you value a transaction, do you value every element of the transaction separately?

A. I guess it would depend on the facts and circumstances.

Q. *Well, in this case when you delivered your opinion to the Court that ... there was not a benefit to the Government or a cost to the OSC, were you analyzing and evaluating every element of the RIF transaction separately.*

A. Well, no. And my opinion is what's stated here.

Q. But your opinion is not then that the RIF transaction did not represent a benefit to the Government or that the RIF transaction did not represent a cost to Old Stone Corporation, correct, Doctor?

 . . .

A. I guess my overall opinion would be that the transaction was—that Old Stone [Corporation] believed the transaction was beneficial to Old Stone Corporation. And my opinion would be that as a whole, the transaction was not beneficial to the Government overall.

Q. But ... overall, *that's notwithstanding the fact that you testified a moment ago that the [Net Worth Maintenance Stipulation] did deliver a benefit to the Government?*

A. Well, that's an element of the transaction, deliver a benefit, that's correct.

(Tr. at 1926–29 (emphasis added).)

Plaintiff notes that the holding company contributed a total of $118 million in stock and cash to FSLIC's insurance fund, "saved the government millions [of dollars] over [the cost of liquidation], paid millions more in insurance premiums to the FSLIC, surrendered its shareholder immunity ..., [and] pledged [the holding company's] entire net worth for the benefit of the FSLIC." (Pl.'s Post–Trial Reply Mem. at 8.) Moreover, the holding company "devoted its managerial resources to the revitalization of the two failed thrifts." (*Id.*) An Office of Thrift Supervision memo to the district director dated March 1990 comments on the strength of management. (Pl.'s Ex. 369.) It states for example that the "association's management is considered competent[;] ... [t]he management team was rated a 2 at the prior examination and the current examination does not seem to indicate a deterioration in that situation." (*Id.* at OTS 01274.) The Government's response was that "*no* witness testified that FSLIC or the FHLBB saw the transaction as a 'huge benefit.'" (Def.'s Post–Trial Reply Br. at 5.)

The Government got what it bargained for, according to plaintiff—an infusion of capital into a failing bank. The Federal Circuit commented in *Hansen,* "there is no doubt that the merger was desirable from the FSLIC's point of view." 367 F.3d at 1316–17 "By assuming the liabilities [of the failing

thrift], the Hansens allowed the FSLIC to avoid the high cost of bailing out another insolvent thrift." *Id.* at 1317. The Supreme Court observed in *Winstar* that goodwill treatment was "essential to supervisory merger transactions of the type at issue in ·[that] case."[38] 518 U.S. at 849, 116 S.Ct. 2432. The Court cited a statement in the Congressional Record that goodwill was an " 'inducement to the healthy savings and loans to merge with the sick ones.' " *Id.* at 850 n. 6, 116 S.Ct. 2432 (quoting 135 Cong. Rec. 12,061 (1989)).

### E. Total Breach

The Government argued that plaintiff obtained part of what it bargained for and therefore the breach cannot be "total." *See, e.g., Hansen,* 367 F.3d at 1309 ("[R]estitution is 'available only if the breach gives rise to a claim for damages for total breach and not merely . . . for partial breach.' " (quoting *Restatement (Second) of Contracts* § 373 cmt. a (1981))); *see also Stone Forest,* 973 F.2d at 1550–51 (holding that materiality is determined by the totality of events and circumstances). The breach occurred five years after government performance of the contract, during which time "[Old Stone Bank] had the full benefit of goodwill and capital credits," defendant points out. (Def.'s Post–Trial Reply Br. at 3.)

A total breach is one that "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." *Restatement (Second) of Contracts* § 243(4) (1981). The appeals court describes this standard as follows: "[f]or all intents and purposes, this is a way of saying that the breach 'must be of a relatively high degree of importance.' " *Hansen,* 367 F.3d at 1311–12 (quoting George E. Palmer, *The Law of Restitution* § 4.5 (1978)). Thus, defendant's breach must substantially impair the value of the contract to plaintiff and it must be a relatively important breach. While substantial impairment is the standard for total breach, we assume that "substantial" is not measured by the

number of provisions that defendant met. Rather it must be measured by the *value* of the benefits that the non-breaching party obtained before the breach. We did not find the status of a list of various forbearances and credits to be useful for this purpose.

Defendant pointed out in closing arguments that the court in *Hansen* did not change the law of restitution, but "reiterated . . . the restitution law that already was in existence. . . ." (Tr. at 2765.) "[W]hen [the Court of Appeals] . . . discuss[ed] the total breach issue . . . it refer[red] back to the [R]estatement . . . perhaps clarifying or edifying what the law already was." (*Id.*) The *Restatement* provides two illustrations to assist in distinguishing between total and partial breach for purposes of determining whether restitution is available:

1. *A* contracts to sell a tract of land to *B* for $100,000. After *B* has made a part payment of $20,000, *A* wrongfully refuses to transfer title. *B* can recover the $20,000 in restitution. The result is the same even if the market price of the land is only $70,000, so that performance would have been disadvantageous to *B.*

2. *A* contracts to build a house for *B* for $100,000, progress payments to be made monthly. After having been paid $40,000 for two months, *A* commits a breach that is not material by inadvertently using the wrong brand of sewer pipe. He has a claim for damages for partial breach but cannot recover the $40,000 that he paid.

*See Restatement (Second) of Contracts* § 373 cmt. a, illus. 1, 2 (1981).

The distinction between these illustrations is the materiality of the breach. In the second illustration, *B* did not receive the sewer pipe he wanted, but he has the substantial benefit of what he bargained for at the time of breach, i.e., a partially built house. *A*'s failure to use the correct brand of pipe does not go to the substance of the bargain; restitution is not available. In the first illustration, however, *A*'s refusal to

---

**38.** These comments from the Supreme Court may be dicta because the Court did not review the materiality of the breach. *See Hansen,* 367 F.3d at 1310–11.

transfer title goes to the heart of the bargain. Breach is total, and restitution is an available and appropriate remedy. The crucial distinction is materiality. In a complex contract case, some benefit may have been conferred on the non-breaching party, and any award of restitution can be offset by that value. *Westfed,* 55 Fed.Cl. at 561; *Restatement (Second) of Contracts* § 384 cmt. a (1981). The amount, however, must be ascertainable and proven. Defendant did not submit sufficient evidence for us to value benefits to plaintiff from the contract provisions that the Government did not breach. We do not have credible alternative numbers.

Defendant argues that plaintiff did not list the $103 million in stock as a cost in its reports to the Securities and Exchange Commission or to its shareholders. If this fact had legal significance, most courts focus on benefits to the breaching party rather than costs to the non-breaching party for purposes of restitution. *Glendale* suggests that the notion of costs to plaintiff in the restitution context should be de-emphasized. *See* 378 F.3d at 1313. Defendant promised capital credits and supervisory goodwill equal to roughly thirty-five percent of Old Stone's total regulatory capital when the contracts were signed. (Tr. at 1213–14.) The bank lost at least $80 million of the regulatory capital promised to it as a result of the breach. (Tr. at 2361.)

Plaintiff's witnesses claimed during trial that the focus of the negotiations for acquisition of Rhode Island Federal was regulatory capital. (*See, e.g.,* Tr. at 148, 271, 733.) Regulatory capital was supremely important to plaintiff. Defendant questions the credibility of plaintiff's witnesses on this point, but we saw no reason to do so. Regulatory capital was certainly a material aspect of the Assistance Agreement for Old Stone Corporation.

### F. Waiver

 The non-breaching party may waive its right to restitution post-breach. The point of waiver in such circumstances is to prevent a non-breaching party from obtaining the benefits of a total breach and escaping his own responsibilities under the contract by terminating prematurely. *See*

*Restatement (Second) of Contracts* § 373 cmt. a, illus. 1, 2 (1981). Plaintiff here continued to perform a part of the contract, the Net Worth Maintenance Stipulation, to its detriment. The holding company downstreamed $74.5 million under pressure from the regulators and lost it all. For plaintiff to waive its right to restitution by attempting to save the bank, and to save the Government money in the process, would be an ironic result.

The Federal Circuit described the *Restatement's* view of restitution in *Hansen:*

> The goal of restitution, to return the parties to their precise state before the contract, is incompatible with the situation of partial breach, *where the non-breaching party has, to some extent, benefitted from the transaction.* It is for this reason that section 384 of the Restatement makes recovery in restitution conditional on the return of any property that the parties have received pursuant to the agreement.

*Hansen,* 367 F.3d at 1309 n. 10 (emphasis added). Thus, continued performance arguably does not create waiver where the non-breaching party did *not* obtain benefits from the contract after the breach. The Supreme Court noted in *Mobil Oil* that "the Government's waiver claim must come down to a claim that the companies received at least partial performance." 530 U.S. at 621–22, 120 S.Ct. 2423. In other words, the non-breaching party must receive some benefit from the performance. *See Coast–to–Coast,* 60 Fed.Cl. at 711 (citing *Mobil Oil,* 530 U.S. at 622–23, 120 S.Ct. 2423) ("[A] party does not waive its right to restitution simply by urging performance, but must actually receive some significant benefit from continuation of the contract."). Defendant did not show that plaintiff received benefit from its performance of the Net Worth Maintenance Stipulation.

### G. Benefits to Plaintiff—Offset

Defendant argued that any award to plaintiff must be reduced by the benefits obtained by plaintiff from the contract. These include dividends that the bank upstreamed to the holding company after the merger. Defendant believes that it should also be given

credit for any profits that the merged institution made after the Assistance Agreement was signed. "Because the purpose of restitution is to restore the plaintiff to its status quo ante, the award to the plaintiff must be reduced by the value of any benefits that it received from the defendant under the contract, so that only the actual, or *net*, loss is compensated." *Landmark*, 256 F.3d at 1373 (citing *Restatement (Second) of Contracts* § 384 cmt. a (1981)("A party who seeks restitution of a benefit that he has conferred on the other party is expected to return what he has received from the other party."))(emphasis added).

The Federal Circuit observed in *Landmark* that "[t]he government's actions were simply not relevant to the dividends, which were generated as a result of Landmark's performance under the contract . . . ." 256 F.3d at 1373–74. "Thus, because the government was not responsible for the dividends paid by [the thrift] to Landmark, offset would not be proper." *Id.* at 1374. The appeals court addressed this matter again in *Hansen*.

> *Landmark* makes clear that offset is proper only where the benefits at issue were received directly from the breaching party. Here, the dividend was not received from the government, nor pursuant to any requirement of the contract. The dividend from Hansens Savings cannot be fairly attributed to the government; accordingly, it should not detract from any recovery by the Hansens of their capital contribution.

*Hansen*, at 1315–16 (citing *Landmark*, 256 F.3d at 1374).

Defendant attempts to distinguish this case from *Landmark* and *Hansen* by arguing that the Assistance Agreement provided for plaintiff's dividends. This argument refers to the Dividend Stipulation. The Dividend Stimulation was a dividend *limitation,* however. It provided that the bank could not pay dividends exceeding a level that was somewhat higher than FSLIC policy at the time. The Government had nothing to do with the bank's dividends other than to limit them.

Defendant also argues that it is entitled to credit for contributions that it made to

Rhode Island Federal ($9.95 million) and to Citizens Federal ($79 million) as part of those transactions. Both banks remained in a posture of negative net worth when plaintiff took them over, however.

## H. Windfall

The breaching party has the burden of proving windfall. *American Capital,* 59 Fed. Cl. at 575 (citing *Restatement (Second) of Contracts* § 349 cmt. a (1981)). Plaintiff lost its business as a result of the contract. The holding company would have had no responsibility for supporting Old Stone Bank but for the Net Worth Maintenance Stipulation. It would not have been necessary to sell other profitable subsidiaries. The "pivotal question" according the Federal Circuit, "is whether an award of restitution would place the [plaintiff] in an overall better position than if the breach of contract had not occurred." *Hansen,* 367 F.3d at 1317. We heard no credible evidence that returning plaintiff's investment would place it in a better position than it would have been had the Government not breached its contract.

The windfall issue is pivotal for another reason. Defendant argued that other economic pressures caused plaintiff's failure, or that the holding company and the bank would have failed irrespective of defendant's participation. If so, it seems that almost any award would be a windfall. Defendant did not offer evidence at trial sufficient for this court to make such findings, however.

## I. Commingled Assets

The Citizen's transaction is not appropriate for restitution because the bank "was substantially altered while in the possession of [Old Stone Corporation]," according to defendant (Def.'s Post–Trial Br. at 33 n. 3.) Defendant explains:

> It was held as a separate subsidiary for one year and then merged in the operations of Old Stone Bank. It was sold in its entirety in May of 1990, four-and-one-half years after OSC had acquired it. During this time period, hundreds, if not thousands, of business decisions were made; assets were sold; assets were purchased; and numerous financial decisions were made.

(*Id.*) If we are to consider the possibility of restitution as a remedy, this rule cannot apply in the circumstances of this case. The requirement that property obtained according to a contract must be returned in the same condition is inappropriate for a transaction of this type, particularly when the property was lost as a result of the breach.

> We agree that the commingling of assets as a result of the ... merger and the subsequent activities of Hansen Savings may make it difficult to "unwind" the transaction between the Hansens and the government for purposes of determining the appropriate amount, if any, that can be restored through restitution. We do not agree with the government, however, that this difficulty, on its own, prevents the Hansens from recovering any restitution. *It is the inherent nature of the merger transaction,* more than any alleged mismanagement after the merger, that makes it impossible for the Hansens to return "any interest in property that [they] ha[ve] received in exchange in substantially as good condition as when it was received by [them] ...." If mismanagement on their part is established, the Hansens may be accountable for any diminishment of the character or value of property that can be directly traced to their mismanagement. However, we do not think that the Hansens' restitution claim may not proceed based solely on the consequences of the merger transaction.

*Hansen,* 367 F.3d at 1318–19 (quoting *Restatement (Second) of Contracts* § 384 (1981)) (emphasis added). The Government did not attempt to trace any losses due to mismanagement or introduce any evidence of mismanagement. We heard no evidence of mismanagement during trial.

## V. CONCLUSION

The Federal Savings and Loan Insurance Corporation told plaintiff to rely on its regulatory capital as though it were real. More importantly, plaintiff was to *use* the goodwill as though it were real. FSLIC said the bank should make loans with it; use it as leverage. Use it as a capital cushion. Include it in the capital ratios. Plaintiff paid $1.5 million per year in premiums to cover whatever risk resulted from this practice, including the possibility that Congress would change the rules. Net losses that defendant may incur from this judgment represent the risks that the Government contracted to insure.

The Federal Circuit has given trial courts some guidance in recent months concerning the proper means of analyzing the remaining *Winstar* cases. *See, e.g., Hansen,* 367 F.3d 1297; *Glendale,* 378 F.3d 1308. One issue in *Hansen* was whether a requirement that plaintiff transfer stock as part of the agreement were a true "condition" of the Assistance Agreement. 367 F.3d at 1317. The court held that it was in those circumstances. *Id.* Defendant made a similar argument here—that the provision requiring transfer of stock was not a term or condition of the contract, but a recital or a condition precedent.

We could assess damages in this case according to principles of reliance, restitution, or mitigation. These remedies are described in some detail in this Opinion to demonstrate their overlapping nature as applied to these facts. Contracts among the parties specifically required contributions that plaintiff wants returned. The breach was "total," and the other elements of restitution are present. Restitution normally does not cover post-breach expenses, but we cannot see how plaintiff's performance of the Net Worth Maintenance Stipulation created a waiver of its rights. If restitution were not available as a remedy, reliance would be. Reliance calls for the court to find that defendant violated the contract and caused foreseeable damages that can be calculated with reasonable precision. Plaintiff established all elements of reliance at trial.

The same is true of mitigation. Plaintiff supported the bank after the breach in an effort to save it and almost succeeded. Defendant argued that mitigation is not available because plaintiff "had" to downstream funds by contract under the Net Worth Maintenance Stipulation. Defendant has argued that issue both ways, depending on the remedy being discussed. We are mindful of the Federal Circuit's practical direction to trial judges in *Glendale* and elsewhere. *See,*

*e.g., Glendale,* 378 F.3d 1308 (giving "additional guidance and support [to] the trial courts ... [so that] the remainder of the *Winstar* cases can be disposed of ... based on the particular facts of the case, and without further dispute over the theory on which damages may be calculated").

Defendant's breach was the cause of plaintiff's damages. Obviously, the breach also was a "substantial factor" in causing plaintiff's damages. *See Energy Capital Corp. v. United States,* 47 Fed.Cl. 382 (2000), *aff'd in part, rev'd in part,* 302 F.3d 1314 (Fed.Cir. 2002). Plaintiff made an effort to operate according to the Assistance Agreement as well as to the requirements imposed after the breach. The bank would not have dropped below the two percent FDICIA[39] capital adequacy level absent the Government's breach; the bank would not have been seized. It is likely that the bank would have survived despite the breach given additional time for an effective and aggressive management team to negotiate its recovery plan. It follows that the breach and regulatory action related to the breach caused the bank's seizure.

 The judgment is based on numbers that are not disputed. The factual issues addressed the extent to which plaintiff might not be entitled to the full amounts. For the most part, defendant did not offer alternative numbers into evidence or provide a means to calculate alleged offsets. The judgment below consists of damages that we verified by credible testimony and other evidence during trial:

1. Old Stone Corporation transferred all of its stock in the commercial bank, Old Stone Bank, to Rhode Island Federal pursuant to the Assistance Agreement, approved by the Federal Home Loan Bank Board as a Supervisory Conversion and Acquisition of Conversion Stock Agreement. The market value of the stock was $103.2 million, an amount not in dispute. The Clerk will enter judgment for plaintiff in the amount of $103.2 million on that claim.

2. Old Stone Corporation contributed three percent of its capital at the time to Citizens Federal as part of a merger agreement similar to that used in Rhode Island Federal, a total of $14.8 million. The Clerk will enter judgment for plaintiff in the amount of $14.8 million on that claim.

3. Old Stone Corporation contributed $74.5 million to its subsidiary Old Stone Bank, FSB pursuant to the Net Worth Maintenance Stipulation. The Clerk will enter judgment for plaintiff in the amount of $74.5 million on that claim.

4. Old Stone Corporation claims that FSLIC adopted an FDIC requirement that it contribute $13 million to Rhode Island Federal before it was permitted to leave the FDIC insurance fund. Old Stone later abandoned that claim, which therefore is DISMISSED.

THEREFORE, the Clerk of Court will enter judgment for plaintiff Old Stone Corporation in the total amount of $192,500,000. No costs.

---

39. Federal Deposit Insurance Corporation Im- provement Act of 1991, Pub.L. No. 102–242.